UNITED STATES of America,
Plaintiff–Appellee,

v.

Rigoberto MOYA–GOMEZ; Celestino Orlando Estevez; Amado Raphael Leon; Adalberto Herrera; and Menelao Orlando Estevez, Defendants–Appellants.

Nos. 87–1262, 87–1280, 87–1310, 87–1390 and 87–1670.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1988.

Decided Sept. 30, 1988.

Rehearing and Rehearing En Banc Denied in No. 87–1670 Dec. 22, 1988.

713

Catherine M. Canright, Milwaukee, Wis., Thomas H. Taylor, Madison, Wis., Michael Ociacovski Weisz, Miami, Fla., for defendants-appellants.

Eric J. Klumb, R. Wagner, Asst. U.S. Attys., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

The appellants are five defendants who were convicted of various offenses under the federal narcotics laws. Their appeals raise a plethora of difficult issues for our consideration. We affirm the convictions of all defendants. However, we vacate Menelao Orlando Estevez' sentence and remand his case to the district court for resentencing.

## I

## Background

### A. *Facts*

This case arises out of an extensive cocaine network centered in Milwaukee, Wisconsin. Testimony at trial revealed the following. Evilio Pinto,[1] an unindicted conspirator, was introduced to Rigoberto Moya–Gomez sometime in the spring of 1985. A short time later, Mr. Pinto learned that Mr. Moya–Gomez was transporting two to three kilograms of cocaine twice monthly from Miami, Florida to Milwaukee. Mr. Pinto decided to join Mr. Moya–Gomez in this criminal venture. In late March 1985, Mr. Pinto and Mr. Moya–Gomez traveled to Miami to purchase cocaine from Mr. Moya–Gomez' source. That source turned out to be Menelao Orlando Estevez. Thereafter, Mr. Pinto and Mr. Moya–Gomez became part of a cocaine organization that was headed by Menelao Orlando Estevez and included his father Celestino Orlando Estevez[2] and his brother Omar Estevez. At the outset, the Milwaukee end of the cocaine enterprise was managed by Mr. Moya–Gomez. In August 1985, however, Mr. Moya–Gomez had a falling out with the Estevez family. As a result, Orlando bought out Mr. Moya–Gomez' cocaine connections and thereafter headed both the Florida and Wisconsin ends of the business.

During the course of the conspiracy, members of the group regularly transported large quantities of cocaine from Miami to Milwaukee. The cocaine would be driven to Milwaukee, usually concealed in the spare tires of various vehicles. Upon its arrival in Milwaukee, the cocaine would be hidden and then distributed from residences and motel rooms obtained by the Estevez family for that purpose. Extensive records of all drug transactions were maintained. Approximately every two weeks, the money made from the sale of cocaine would be driven back to Florida. Lawrence Jackman, a member of the conspiracy, pleaded guilty and testified at trial about these various activities. As is evident in our later discussion of the sufficiency of the evidence claims raised by several of the defendants, Mr. Jackman's testimony—along with that of Evilio Pinto—proved crucial to the government's success in obtaining convictions against the defendants.

Over a nine-month period, state and federal officials conducted an investigation into the Estevez organization. Several of the defendants were placed under surveillance. Searches of discarded garbage at residences associated with the defendants regularly turned up evidence of narcotics trafficking such as plastic bags with cocaine residue, drug records, and narcotics paraphernalia. In addition, investigating officers discovered that various vehicles were registered under false names at addresses under surveillance. In the culmination of their efforts, on June 30, 1986 at approximately 7:40 a.m., federal and state officers and agents executed simultaneous search warrants at a house located at 173 North 63rd Street, Milwaukee and a house located at 8495 Woodvale Drive, Oak Creek, a suburb of Milwaukee. Celestino was arrested at the 63rd Street house. Agents of the Drug Enforcement Agency (DEA) searched the house and seized approximately 750 grams of cocaine from an orange safe in the closet of a bedroom, three handguns, and numerous drug paraphernalia, drug notes and documents.

---

1. The record is unclear about the spelling of Mr. Pinto's first name. He sometimes is referred to as Evelio and other times as Evilio. We have no way of knowing which is correct and will simply use Evilio for the sake of consistency.

2. To avoid confusion, we hereinafter will refer to Celestino Orlando Estevez as Celestino and Menelao Orlando Estevez as Orlando.

Amado Raphael Leon and Adalberto Herrera were arrested at the Oak Creek residence. DEA agents also searched that house and seized approximately 17 kilograms of cocaine from a gray safe in the master bedroom, three handguns, $18,000 in United States currency, and numerous drug paraphernalia, drug notes and documents. On July 11, 1986, pursuant to a second search warrant, officials discovered an additional 12 kilograms of cocaine hidden in a brown Ford LTD parked in the garage at the Oak Creek residence. The keys to the LTD had been found on Celestino's person at the time of his arrest.

Neither Rigoberto Moya–Gomez nor Orlando Estevez was present at either the 63rd Street house or the Oak Creek house on the morning of the searches. However, they did not escape the authorities for very long. Mr. Moya–Gomez was arrested on August 21, 1986 following a high-speed car chase. Orlando Estevez was arrested on August 27, 1986 during the execution of a search warrant at his residence in Miami. A search of his Miami residence uncovered an arsenal of weapons, a sum of money in excess of $21,000, two address books, numerous documents bearing the names of other codefendants, several documents detailing large cash purchases, a document entitled "Cocaine Handbook—An Essential

Reference," and other miscellaneous drug-related items.

### B. *Procedural History*

Celestino Estevez, Amado Leon, and Adalberto Herrera were named in the original indictment, returned by a federal grand jury on July 8, 1986. Thereafter, on August 26, 1986, the government obtained a superseding indictment that named an additional sixteen defendants, including Rigoberto Moya–Gomez and Orlando Estevez. In count 1 of the superseding indictment, the government charged all of the defendants with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846.[3] In various other counts, the government charged some of the defendants with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).[4] In addition, the superseding indictment provided for the forfeiture of any property belonging to any of the defendants that was obtained with drug proceeds, including certain items listed therein.[5] On September 9, 1986, the grand jury returned a second superseding indictment. The second superseding indictment was identical to the superseding indictment except that several assets were added to the forfeiture provision and two counts were added charging Celestino Estevez and Orlando Estevez with operating a continuing criminal enterprise in violation of 21 U.S.C. § 848.[6]

**3.** Section 846 of title 21 of the United States Code provides that: "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

**4.** Section 841(a)(1) of title 21 of the United States Code provides that: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...." 21 U.S.C. § 841(a)(1).

**5.** The forfeiture provision of the superseding indictment provided that, upon conviction, each defendant would forfeit to the United States: (1) any property constituting or derived from any proceeds the person obtained, directly or indirectly, as the result of such violation, and (2) any of the person's property used or in-

tended to be used, in any manner or part, to commit or facilitate the commission of such violation; pursuant to Title 21, United States Code, Section 853.
Orlando R.1 (Superseding Indictment). [Citations are to the Record on Appeal of the appellant whose name precedes the citation.]

**6.** Section 848 of title 21 of the United States Code provides in pertinent part:
(d) Continuing criminal enterprise defined
For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—
(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

Seven of the defendants named in the indictment[7] were tried jointly in the Eastern District of Wisconsin, Judge Terence Evans presiding. The trial commenced on November 17, 1986 and ended on December 17, 1986.[8] Following a month of trial, the jury returned verdicts of guilty as to all defendants on all charges. The jury also returned a special verdict of forfeiture as to those assets specifically described in the forfeiture provision of the indictment.

## II

### Appeal of Menelao Orlando Estevez, No. 87–1670

Orlando Estevez was convicted of one count of conspiracy to possess cocaine with intent to distribute (count 1), six counts of possession of cocaine with intent to distribute (counts 3, 4, 7, 9, 13, and 14) and one count of conducting a continuing criminal enterprise (count 20). The district court sentenced Orlando to fifty years imprisonment on count 20, twenty years imprisonment on counts 4, 7, 9, and 13 to run concurrent with each other and consecutive to count 20, and fifteen years imprisonment on counts 3 and 14 to run concurrent with each other and concurrent with the sentence imposed on counts 4, 7, 9, and 13. Orlando asserts six reasons why he is entitled to a new trial: (1) the district court violated his sixth amendment right to counsel of choice by issuing a pretrial restraining order pursuant to the criminal forfeiture statute that encompassed attorneys' fees; (2) the district court violated his fifth amendment due process rights by refusing to hold a prompt, adversary, postrestraint evidentiary hearing to determine whether the restraining order was valid; (3) the district court erred by permitting him to proceed *pro se* without knowingly, intelligently, and voluntarily having waived his sixth amendment right to counsel; (4) the district court violated his speedy trial rights by denying him a continuance; (5) the district court violated his due process rights by denying him access to a law library, and equipment and services necessary for preparing a defense; and (6) the district court violated his due process rights by sentencing him to seventy years in prison. We address each of these contentions *seriatim*.

### A. *Criminal Forfeiture*

The most significant issue raised by these consolidated appeals concerns the criminal forfeiture provision in the indictment. The issues that we must decide are (1) whether the pretrial restraint of a defendant's assets pursuant to the criminal forfeiture statute, 21 U.S.C. § 853, including funds that the defendant would otherwise use to pay attorneys' fees, violates the defendant's sixth amendment right to counsel of choice; and (2) whether the pretrial restraint of a defendant's assets without affording him an immediate postrestraint hearing violates the due process clause of the fifth amendment.

### 1. Background

■■■■ On September 2, 1986, the government sought an *ex parte* restraining order from the district court pursuant to the forfeiture provision of the indictment[9] and 21 U.S.C. § 853(e)(1)(A).[10] On Septem-

---

(B) from which such person obtains substantial income or resources.
21 U.S.C. § 848(d) (Supp. IV 1986).

**7.** References to the indictment hereinafter are made to the second superseding indictment.

**8.** The indictment named twenty defendants. Three of the twenty were granted separate trials. Ten defendants either entered guilty pleas or agreed to plead guilty. Of the seven defendants who went to trial on November 17, 1986, two have not appealed their convictions.

**9.** *See supra* note 5.

**10.** Section 853(e)(1)(A) of title 21 of the United States Code provides:

(e) Protective Orders
(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) of this section for forfeiture under this section—
(A) upon the filing of an indictment or information charging a violation of this subchapter or subchapter II of this chapter for which criminal forfeiture may be ordered under this section and alleging that the property

ber 12, 1986, the district court entered the *ex parte* restraining order. The order prohibited the defendants [11] from "selling, assigning, pledging, distributing, encumbering, or otherwise disposing of, removing from the jurisdiction of [the] court, or wasting, any and all part of their interest, direct or indirect, in the property described in the Forfeiture Provisions of the Second Superseding Indictment...." Orlando R.5B.

Orlando was arraigned in the Eastern District of Wisconsin on September 30, 1986. At that time, attorney William P. Cagney III of Miami, Florida was present. Mr. Cagney advised the district court that he was entering a limited appearance for the purpose of litigating the forfeitability of attorneys' fees prior to committing to the unconditional representation of Orlando. On October 8, 1986, Mr. Cagney filed a motion on behalf of Orlando in which he asked the district court (1) to modify the *ex parte* restraining order entered on September 12, 1986 to permit Orlando to expend his own funds to retain counsel of his choice; (2) to modify the *ex parte* restraining order to allow Orlando living expenses

for his family; and (3) "to conduct a prompt hearing wherein the government will be *immediately* required to establish that it is likely to convince a jury beyond a reasonable doubt that ORLANDO ESTEVEZ committed a violation of CCE [continuing criminal enterprise] and that all of his assets were derived therefrom." Orlando R.11 at 1 (emphasis in original). The motion asserted that "[a]bsent a modification of the restraining order, Mr. Estevez will be unable to retain counsel...." *Id.* at 2. The motion also stated that "Mr. Estevez desires to retain Mr. Cagney and his law firm to defend him" but that "Mr. Cagney and his law firm will not enter unconditional appearances as his counsel in this case unless and until the issues and questions concerning the forfeiture of attorneys fees is [sic] determined by this Court." *Id.* at 3.

On October 20, 1986, the district court issued an opinion on the attorneys' fees question. The court stated that "[i]nterpreting the forfeiture provisions of the Act to include attorney fees raises serious con-

---

with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section; ....

21 U.S.C. § 853(e)(1)(A) (Supp. IV 1986).

**11.** The only other defendant to challenge the restraining order in this case is Celestino Estevez. Celestino was originally represented by attorney Richard Congdon, who had been appointed to represent him. Celestino R.4. Mr. Congdon was then replaced by attorney John F. McNally, who Celestino had retained. Celestino R.14. After the grand jury returned the superseding indictment with its forfeiture provision, Mr. McNally withdrew as Celestino's attorney. Celestino R.34. Attorney Clifford R. Steele, who ultimately represented Celestino at trial, was appointed to take over Celestino's representation. Celestino R.36. Celestino argues that the pretrial restraining order precluded him from hiring counsel of choice, presumably Mr. McNally.

We decline to consider Celestino's arguments on this issue because he never raised them in the district court. Orlando Estevez' attorney, William P. Cagney III, explicitly stated that he was arguing for exemption of attorneys' fees on behalf of Orlando and did "not wish to raise [the issue] on [Celestino's] behalf." Tr. of Sept. 30, 1986 at 6. Celestino contends that Mr. Steele adopted the arguments made by Mr. Cagney. However, Mr. Steele's only comment was

that he "believe[d] Mr. Cagney's articulated request at this point would probably follow to Mr. McNally." *Id.* at 22. This comment is insufficient to raise the forfeiture issue with respect to Celestino. There is no indication in the record that the issue was presented squarely to the district court; no pretrial motions ever were filed on Celestino's behalf raising the issue, and the district court's memorandum opinion on the forfeiture question addressed only Orlando's arguments as presented by Mr. Cagney. A defendant may not argue as a ground for reversal an issue that was not presented to the trial court. *United States v. Hollins,* 811 F.2d 384, 386 (7th Cir.1987); *Holleman v. Duckworth,* 700 F.2d 391, 394–95 (7th Cir.), *cert. denied,* 464 U.S. 834, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). The waiver rule is, of course, subject to the plain error doctrine of Rule 52(b) of the Federal Rules of Criminal Procedure. *See United States v. Fuesting,* 845 F.2d 664, 670–71 (7th Cir.1988). However, contentions raised for the first time on appeal under Rule 52(b) "must be newly-raised questions of law, untainted by factual ambiguity." *United States v. McCabe,* 720 F.2d 951, 955 (7th Cir.1983). In light of the fact that Celestino's forfeiture claim is rife with factual ambiguities regarding whether he in fact attempted to retain counsel of choice and in fact was prevented from doing so by the district court's order, we hold that he has waived the forfeiture question for purposes of this appeal.

stitutional questions." *United States v. Estevez*, 645 F.Supp. 869, 870 (E.D.Wis. 1986). The court noted that the statute exempts from forfeiture transfers made to a " 'bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture....' " *Id.* at 871–72 (quoting 21 U.S. C. § 853(c)). However, the court also noted that "it is understandably difficult for an attorney to qualify under that exception. He is defending a person accused of violations which lead to forfeiture. He can hardly argue that he was without cause to believe the property was subject to forfeiture." *Id.* at 872. Nevertheless, the court concluded that "because the spirit of the statute allows for exceptions, and because of the constitutional questions the statute raises, it seems reasonable to conclude that Congress intended that legitimate attorney fees be excepted." *Id.*

Having construed the statute as exempting attorneys' fees from forfeiture, the court then defined what constituted *legitimate* attorneys' fees:

> While I believe that *legitimate,* which I take to mean *reasonable,* attorney fees are excepted from the forfeiture provisions, exorbitant fees are not. I believe that the court, to save the statute, must have some control over the size of the fee to be carved out of the forfeiture. In this case, I believe that Mr. Estevez can find an eminently qualified attorney to represent him in this case for $40,000. The defendant may, as his motion asks, "expend his own funds" to pay his counsel, and up to $40,000 paid to his attorney will not be subject to forfeiture. The

request for other funds is DENIED and, because the trial here is set for November 17, 1986, no hearing will be held. *Id.* (emphasis in original).

On October 27, 1986, Orlando filed a *pro se* motion in which he argued that the district court's resolution of the fee issue "continue[d] to thwart [him] from retaining counsel of his choice." Orlando R.15 at 1. Orlando asserted that a reasonable fee for Mr. Cagney would be in excess of $125,000. This estimation was based in part on Mr. Cagney's evaluation of the complexities of the case and in part on conversations that Mr. Cagney had with three other criminal defense lawyers, two in Miami and one in Milwaukee. *Id.* at 2. Orlando asserted that the district court's estimation of what constituted a "reasonable" fee was arbitrary because the court did not explain how it arrived at the $40,000 figure or otherwise announce the standards of reasonableness on which it relied. Orlando contended that the district court should never set the fee for retained counsel. According to Orlando, "[i]t is enough that retained counsel affirm that any monies paid him by his client are paid solely as attorney fees and related necessary costs." *Id.* at 3. At the very least, Orlando concluded, the district court should "hold a hearing and accept affidavits of experienced criminal trial counsel as to what would be a fair and equitable fee a client should be allowed to pay his counsel prior to the trial of this cause." *Id.* at 2–3.[12]

Later in the day on October 27, 1986, the district court held a pretrial conference. At this time, the court entertained oral argument by Mr. Cagney on the issues raised in Orlando's motion for reconsidera-

---

**12.** At the same time that Orlando filed his motion for reconsideration in the district court, he also filed a notice of appeal to this court. Orlando R.17. This notice of appeal stated that Orlando was appealing from the district court's "Order of October 20, 1986 wherein th[e] [c]ourt continued the preliminary injunction entered September 12, 1986, without a hearing and refused to exempt from forfeiture the fees agreed by Defendant ESTEVEZ to be paid to his private counsel, except for an amount arbitrarily imposed by th[e] [c]ourt." *Id.* On November 4, 1986, we asked the parties to brief jurisdictional issues related to Orlando's interlocutory appeal.

On November 7, 1986, Orlando asked us to stay the district court proceedings pending the resolution of his interlocutory appeal. On November 14, 1986, after the parties addressed the jurisdictional questions, we denied Orlando's motion for a stay. Orlando therefore was tried as scheduled on November 17, 1986, and was convicted on December 17, 1986. On February 2, 1987, we dismissed Orlando's interlocutory appeal as moot because he could raise his challenge to the district court's forfeiture decision in the present postconviction appeal. *See United States v. Estevez,* 852 F.2d 239, 240 and n. 3 (7th Cir.1988).

tion. In response to Mr. Cagney's arguments, the district court reiterated that Orlando was free to expend his own funds *and* up to $40,000 paid to an attorney would not be subject to forfeiture. Orlando R.25 at 36 (Tr. of Oct. 27, 1986—Partial Proceedings). The court indicated that it did not think that the issue of a fee in excess of $40,000 was ripe at that time:

What we're dealing here with is a very elusive thing. First of all, I don't know if the defendant has any more money, for one thing. I don't know if the defendant would even be convicted. Let's suppose the defendant decided to give Mr. Cagney $150,000 or something. He may be acquitted. He may be convicted and the government may decide they can't show that the funds were obtained by his being involved in drug related activities. There is a lot of unknowns out here.

*Id.* However, the court stated that it might consider raising the $40,000 limit at a later point. The court said: "Now, obviously if I became convinced at some time in this case that a sum in excess of [$40,000] was necessary to retain a competent lawyer and what the lawyer did in the case exceeded $40,000, I think I could and I would modify this order." *Id.* Mr. Cagney nevertheless declined to represent Orlando under the conditions imposed by the district court's October 20, 1986 order as orally amended on October 27, 1986.

### 2. The Sixth Amendment Issue

#### a.

As a preliminary matter, we must decide whether we even need to reach the forfeiture issue. The government argues that we do not, for three reasons. First, the government contends that Orlando's reading of the district court's restraining order was overly broad, and that the order froze only those assets specifically listed in the forfeiture provision of the indictment. Second, the government asserts that the restraining order did not prohibit Orlando from paying fees to an attorney of his choice and that Orlando thus was always free to pay Mr. Cagney whatever he wished with his own funds. Third, the government argues that, in any case, Or-

lando's sixth amendment rights were not violated because the district court in fact exempted $40,000 in attorneys' fees from the restraining order. We reject the government's contentions on all three points.

The government's first argument assumes that the forfeiture provision in the indictment reached only those assets specifically listed therein. In this regard, we note that the indictment states that the property to be forfeited "shall include *but not be limited to*" the property thereafter listed. Orlando R.4 (emphasis supplied). The government conceded before the district court that this provision is "admittedly ambiguous," but explained that it did not intend that the restraining order reach assets not specifically identified in the forfeiture provision. Orlando R.13 at 2. The government further stated that it assumed that the district court also did not intend to restrain assets other than those specifically described in the forfeiture provision. The district court's only comment in this regard was its statement that *"[a]rguably, the order also prohibits the disposal of assets which, if there is a conviction, will be found to have been obtained from violating the law."* *Estevez*, 645 F.Supp. at 869 (emphasis supplied). We need not resolve this ambiguity because, as we shall explain, Orlando's sixth amendment right to counsel of choice was implicated by the forfeiture provision regardless of whether his assets were subject to a pretrial restraining order.

In addition to the above, the government's first and second arguments assume that Orlando could have paid his lawyer with assets not listed in the forfeiture provision of the indictment. In response to Orlando's motion in the district court to exclude attorneys' fees from forfeiture, the government contended that Orlando "ha[d] not shown that no unforfeitable funds [were] available to pay his counsel," Orlando R.13 at 7, and that Orlando also had not shown that he "propose[d] to pay attorney fees from funds generated by the liquidation of assets named in the forfeiture provisions." *Id.* at 8. The government

concluded that, "absent any indication to the contrary, we must assume that the defendant ha[d] access to unrestrained funds not named in the forfeiture provisions, with which he can pay Mr. Cagney." *Id.*

However, Orlando asserted in his motion to exempt attorneys' fees that the restraining order "froze *all of* [his] assets," Orlando R. 11 at 5 (emphasis supplied), and that the "restraining order effectuated a total forfeiture of the defendant's assets." *Id.* at 27. The district court never made a finding on whether Orlando had other assets with which to pay counsel. The district court's only comments on the matter were to note that the government contended that Orlando could pay his lawyer with assets not mentioned in the forfeiture provision and to state in a conclusory manner that, notwithstanding the government's contentions, "it seems clear that a defendant has standing to raise the issues Estevez raises here." *Estevez,* 645 F.Supp. at 870 (citing *United States v. Bassett,* 632 F.Supp. 1308 (D.Md.1986)). While the district judge held that Orlando was free to expend his own funds to pay counsel, *id.* at 872, he also commented that he did not "know if the defendant ha[d] any more money." Orlando R.25 at 36. Thus, the issue of whether Orlando *had* any of his own funds outside of the items listed in the forfeiture provision never was addressed or decided explicitly. We cannot resolve this factual dispute on appeal.

 In any case, even if Orlando had funds outside the restraining order with which to hire Mr. Cagney—indeed, even if there had been no restraining order at all—we cannot say that the forfeiture provision of the indictment did not affect his right to counsel of choice. Under the "relation back" provision of the forfeiture statute, title to a defendant's property ultimately found to be forfeitable is deemed to vest in the government "upon the commission of

the act giving rise to forfeiture under this section." 21 U.S.C. § 853(c).[13] Thus, any property transferred to an attorney prior to trial ultimately may be forfeited if the defendant is convicted. As the Fourth Circuit said in a recent opinion on the subject:

> Pre-conviction restraining orders *and, indeed, the mere threat of ultimate forfeiture without any such orders* operate directly and immediately to inhibit a defendant's ability to retain private counsel for his defense. Counsel inevitably will be reluctant or unwilling to accept private employment knowing that they may not be able to collect or retain agreed-upon fees.

*United States v. Harvey,* 814 F.2d 905, 921 (4th Cir.1987) (emphasis supplied), *rev'd in part on other grounds sub nom., In re Forfeiture Hearing as to Caplin & Drysdale, Chartered,* 837 F.2d 637 (4th Cir. 1988) (en banc), *petition for cert. filed,* 56 U.S.L.W. 3739 (U.S. Apr. 11, 1988) (No. 87–1729); *see also United States v. Monsanto,* 852 F.2d 1400, 1403 (2d Cir.1988) (en banc) (per curiam) (Feinberg, C.J., concurring) ("the 'relation back' provision of 21 U.S.C. § 853(c) has the same effect as a restraining order when applied to attorney's fees, since practical considerations will keep an attorney from accepting fees based upon the contingency of success at the criminal trial"). Assuming *arguendo* that Orlando had assets other than those subject to the restraining order with which to pay attorneys' fees, the distinct possibility existed that the government would seek forfeiture of those other assets after his conviction. Thus, while the government may have been correct that there was "no current impediment to Mr. Cagney's acceptance of fees for the representation of Mr. Estevez," Orlando R.13 at 4, the threat of forfeiture, as a practical matter, impacts upon the defendant's sixth amendment right to counsel of choice.[14] Of course, the

13. *See infra* note 20.

14. The threat of forfeiture in this case was made clear in the government's argument in the district court:

> While the government feels that the defendants and their agents have probably accumu-

lated additional assets which are subject to forfeiture, it was simply not the government's intention to ask the court to restrain unidentified assets, the existence of which the government could not concretely demonstrate *at this time.*

defendant must demonstrate that he desired to hire counsel of choice and that the threat of forfeiture prevented him from doing so. *Cf. United States v. Pipito*, 861 F.2d 1006, —— (7th Cir.1987) (court holds that the defendant's "Sixth Amendment right to effective assistance of counsel argument makes little sense because he was always represented, and most of the time by counsel of his choice"). But we think this showing certainly was made here. The forfeiture provision clearly prevented Orlando from hiring his counsel of choice, Mr. Cagney.

■ Finally, we address the government's third argument that Orlando cannot complain of a sixth amendment violation because the district court exempted $40,000 to pay attorneys' fees. This contention ignores the basis for Orlando's sixth amendment claim. Orlando argues that his sixth amendment right entails the right to pay an attorney of his choice whatever he wants as long as those fees are a bona fide payment for legal services rendered. Although we ultimately may disagree with Orlando's characterization of his sixth amendment right, we are squarely presented with deciding whether that characterization is the correct one. It is to this task that we now turn.

b.

■ In 1984, Congress amended the criminal forfeiture provisions of both the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and the Continuing Criminal Enterprise (CCE) statute, 18 U.S.C. § 848, under which Orlando was convicted. These amendments sought to address specific problems perceived by the government in utilizing the criminal forfeiture statutes as initially drafted in 1970.[15] "[T]he bill ... is designed to enhance the use of forfeiture, and in particular, the sanction of criminal forfeiture, as a law enforcement tool in combatting two of the most serious crime problems facing the country: racketeering and drug trafficking." S.Rep. No. 225, 98th Cong., 2d Sess. 191, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3374. The Senate Report describes the perceived problems in preamendment criminal forfeiture law:

> [A] serious problem in achieving the forfeiture of significant assets in racketeering and drug cases is that the criminal forfeiture provisions of the RICO and CCE statutes fail adequately to address the phenomenon of defendants defeating forfeiture by removing, transferring, or concealing their assets prior to conviction. Unlike civil forfeitures, in which the government's seizure of the asset occurs at or soon after the commencement of the forfeiture action, in criminal forfeitures, the assets generally remain in the custody of the defendant until the time of his conviction for the offense upon which the forfeiture is based. Only after conviction does the government seize the asset. Thus, a person who anticipates that some of his property may be subject to criminal forfeiture has not only an obvious incentive, but also ample

---

Moreover, it is not the government's intention to seek the forfeiture of any attorney's fees *in this criminal case.... [I]t remains the government's position that every asset owned by defendant Menelao Orlando Estevez, whether directly or through nominees, is forfeitable to the United States. From the government's viewpoint, this would include fees paid to Mr. Cagney and traceable to his client.*

Orlando R.13 at 2–3 (emphasis supplied). The government further argued that it would seek forfeiture of other assets, if at all, only in a separate civil proceeding under 21 U.S.C. § 881. *Id.* at 3–4. We fail to see how this fact advances the government's argument that the forfeiture provision of the indictment did not impede Orlando's ability to hire his attorney of choice.

**15.** Criminal forfeiture "is an *in personam* proceeding against a defendant in a criminal case and is imposed as a sanction against the defendant upon his conviction." S.Rep. No. 225, 98th Cong., 2d Sess. 193, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3376. In contrast, civil forfeiture is an *in rem* proceeding against the property that the government seeks to obtain, without regard to the guilt or innocence of the property owner "because the theory is that the property itself has committed the wrong." *United States v. Nichols*, 841 F.2d 1485, 1486 (10th Cir.1988) (citing *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–81, 94 S.Ct. 2080, 2090, 40 L.Ed.2d 452 (1974)).

opportunity, to transfer his assets or remove them from any possibility of forfeiture.

*Id.* at 3378. In response to this problem, section 853 of the CCE statute now permits the government to apply to the district court for a restraining order once an indictment is returned in order "to preserve the availability of property" that the government claims is subject to forfeiture. 21 U.S.C. § 853(e)(1). The statute does not expressly exclude attorneys' fees from the property subject to restraint. Our first task, therefore, is to determine whether the statute, properly read, applies to attorneys' fees.

c.

■ We begin with the wording of the statute. It is clear that the plain language of section 853 makes no exception for attorneys' fees.[16] As the Tenth Circuit explained:

The language of section 853 is clear. Assets subject to forfeiture include "any property" obtained as a result of the crime, "any of the person's property" used to commit the crime, and "any of his interest in" a continuing criminal enterprise. The only limitations on what property can be forfeited relate to the nexus with the illegal activity. How a defendant intends to use property that would otherwise be forfeited is irrelevant. Property is not exempted because

a defendant wants to use it to pay an attorney any more than property is exempted because a defendant wants to purchase a house or employ a financial advisor. As the Fourth Circuit said in [*United States v.*] *Harvey*, "Property marked for or paid as attorney fees is necessarily included within that defined as subject to forfeiture [in the statute] for the simple reason that those provisions define forfeitable property without regard to its intended or actual use, whether for payment to attorneys or for other uses." 814 F.2d at 914.

*United States v. Nichols*, 841 F.2d 1485, 1492 (10th Cir.1988).

Given the unambiguous wording of the statute, there is no need to refer to the legislative history. *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir.1987); *Kelly v. Wauconda Park Dist.*, 801 F.2d 269, 270 (7th Cir. 1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987). Nevertheless, an examination of the relevant history of the statute's legislative gestation produces nothing to undermine our conclusion with respect to the plain meaning. Indeed, it supports the wording of the statute. The House Report specifically notes that the treatment of attorneys' fees under the forfeiture statute is to be left to the courts. *See* H.R.Rep. No. 845, 98th Cong., 2d Sess., pt. 1, at 19 n. 1 (1984).[17] The Senate Re-

---

16. The statute provides in pertinent part:

(a) Property subject to criminal forfeiture

Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and

(3) in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 848 of this title, the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or

contractual rights affording a source of control over, the continuing criminal enterprise. The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this subchapter or subchapter II of this chapter, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

21 U.S.C. § 853(a) (Supp. IV 1986); *see also* 21 U.S.C. § 853(b) (Supp. IV 1986) (defining "property" for purposes of the section); and 21 U.S.C. § 853(n) (Supp. IV 1986) (dealing with the rights of third parties).

17. The House Report states in relevant part:

Nothing in this section is intended to interfere with a person's Sixth Amendment right to counsel. The Committee, therefore, does not

port states broadly that the purpose of criminal forfeiture is to "strip these offenders [racketeers and drug dealers] and organizations of their economic power." S.Rep. No. 225, *supra*, at 3374. In determining that the statute does not reach legitimate attorneys' fees, some courts have focused on other language in the Senate Report expressing concern with sham or fraudulent transactions that defeat forfeiture.[18] *See United States v. Ianniello*, 644 F.Supp. 452, 455–56 (S.D.N.Y.1985); *United States v. Rogers*, 602 F.Supp. 1332, 1347 (D.Colo.1985). We do not think the Senate Report can be read so narrowly. Certainly, Congress' manifest concern with sham transactions does not indicate that its focus was narrowed exclusively to these abuses —especially when the language of the statute itself protects only the bona fide purchaser who purchases "reasonably without cause to believe that the property was subject to forfeiture...." 21 U.S.C. § 853(n)(6). *See Nichols*, 841 F.2d at 1494. Accordingly, we conclude that the statute as written applies to attorneys' fees.[19]

### d.

We turn therefore to the argument that the application of the statute to attorneys' fees violated Orlando's sixth amendment right to counsel by depriving him of his counsel of choice. It is not in dispute that a criminal defendant has a *qualified* right to retain counsel of his own choosing to conduct his defense in a criminal case. *See In the Matter of Klein*, 776 F.2d 628, 633 (7th Cir.1985); *Ford v. Israel*, 701 F.2d 689, 692 (7th Cir.), *cert. denied*, 464 U.S. 832, 104 S.Ct. 114, 78 L.Ed.2d 114 (1983). More than fifty years ago, the Supreme Court stated that "[i]t is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932); *see also Crooker v. California*, 357 U.S. 433, 439, 78 S.Ct. 1287, 1291, 2 L.Ed.2d 1448 (1958); *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). However, the sixth amendment right is not solely, or even primarily, concerned with ensuring that a criminal defendant be pro-

resolve the conflict in District Court opinions on the use of restraining orders that impinge on a person's right to retain counsel in a criminal case. Compare *United States v. Meinster, supra* (court approved post-indictment transfer of assets to defendant's retained counsel); *United States v. Mandel*, 408 F.Supp. 679, 682–684 (D.Md.1976) (court denies order restraining transfer of assets), *With United States v. Bello*, 470 F.Supp. 723 (S.D.Cal.1979) (court approves restraining order because appointed counsel is available). H.R.Rep. No. 845, 98th Cong., 2d Sess., pt. 1, at 19 n. 1 (1984).

**18.** *See* S.Rep. No. 225, *supra* note 15, at 3383–84 ("The purpose of this provision is to permit the voiding of certain pre-conviction transfers and so close a potential loophole in current law whereby the criminal forfeiture sanction could be avoided by transfers that were not 'arms' length' transactions."); *id.* at 3392 n. 47 ("The provision [section 853(n)(6)] should be construed to deny relief to third parties acting as nominees of the defendant or who have knowingly engaged in sham or fraudulent transactions.").

**19.** We are aware that Judge Winter of the Court of Appeals for the Second Circuit is of the view that the statute can be construed so as to avoid any constitutional difficulty. *See United States*

*v. Monsanto*, 852 F.2d 1400, 1405–11 (2d Cir. 1988) (en banc) (per curiam) (Winter, J., concurring). In *Monsanto*, Judge Winter, with whom Judges Meskill and Newman join, concludes that "(i) [the forfeiture statute] does not permit the pre-conviction restraint of funds needed by a defendant to make ordinary lawful expenditures, including expenditures to retain private legal counsel; and (ii) expenditures expressly authorized by the district court for such purposes are not subject to post-conviction forfeiture." *Id.* at 1405 (Winter, J., concurring). We are conscious of our obligation to attempt to construe the statute so as to save it from constitutional infirmity. However, as Judge Mahoney points out in a dissenting opinion in *Monsanto*, there are substantial difficulties with Judge Winter's approach. *See id.* at 1412–15 (Mahoney, J., dissenting). After discussing the statutory language and the legislative history, Judge Mahoney concludes that Judge Winter's view is not a credible reading of the congressional purpose. We agree, as amply discussed in the text, that the statutory language and legislative history do not support such a reading. *Accord In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F.2d 637, 641–42 (4th Cir.1988) (en banc), *petition for cert. filed*, 56 U.S.L.W. 3739 (U.S. Apr. 11, 1988) (No. 87–1729); *Nichols*, 841 F.2d at 1491–96. We therefore are constrained to hold that the statute encompasses attorneys' fees.

vided with his counsel of choice. As the Supreme Court recently explained:

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." In *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981), we observed that this right was designed to assure fairness in the adversary criminal process. Realizing that an unaided layman may have little skill in arguing the law or in coping with an intricate procedural system, *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932); *United States v. Ash,* 413 U.S. 300, 307, 93 S.Ct. 2568, 2572–73, 37 L.Ed. 2d 619 (1973), we have held that the Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). We have further recognized that the purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984). *Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.* See *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–1618, 75 L.Ed.2d 610 (1983); *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

*Wheat v. United States,* —— U.S. ——, 108 S.Ct. 1692, 1696–97, 100 L.Ed.2d 140 (1988) (emphasis supplied). Thus, while all criminal defendants are entitled to some counsel, the circumstances under which a defendant is entitled to counsel of choice has been limited by other considerations, some under governmental control, some not. As the Fourth Circuit noted:

Purely private predicaments may leave a defendant without the counsel of his choice. Any attorney may decline to accept a case despite the fact that he was chosen by a defendant. This decision may be made for the simple financial reason that the attorney does not expect the defendant to be able to pay. The possibility also exists that a creditor might obtain liens against a criminal defendant's property, preventing the defendant from hiring a lawyer. Rules imposed by the government may likewise prevent the hiring of chosen counsel. Rules requiring appointment of local counsel may have this effect. See *Ford v. Israel,* 701 F.2d 689, 692–93 (7th Cir. 1983). Court-imposed scheduling may also prevent participation by chosen counsel. See *[United States v.] Inman,* 483 F.2d [738] at 740 [4th Cir.1973].

*In re Forfeiture Hearing as to Caplin & Drysdale, Chartered,* 837 F.2d '637, 645 (4th Cir.1988) (en banc), *petition for cert. filed,* 56 U.S.L.W. 3739 (U.S. Apr. 11, 1988) (No. 87–1729).

Forfeiture, or a restraining order freezing assets to ensure their availability for forfeiture, is another factor that can qualify the right to retain counsel of choice. A person cannot retain an attorney whose fee he cannot pay with his own assets. In the forfeiture situation, the assets in question are not the defendant's. As the Fourth Circuit so aptly stated:

The very point of the inclusion of forfeiture in an indictment is the government's assertion that the assets possessed by a defendant are not legally his own, but the fruits of crime in which the law recognizes no ownership rights of the defendant. Forfeiture is not an attempt to punish those with legal assets by denying them an attorney; it is an assertion that the defendant does not have the

legal assets that entitle him to a right to counsel of choice in the first place.

*Id.* at 644. The Fourth Circuit further explained:

> The most relevant analogy ... is to the example of bank robbers' loot. Suppose a bank is robbed and $100,000 taken. A defendant is arrested in possession of $100,000 and nothing more. The defendant protests his innocence and claims, without the slightest proof, that the $100,000 was in fact a gift from a friend. Surely no one will contend that the $100,000 must be made available to pay the defendant's lawyer, and not be kept available for return to the bank in the event the defendant is found guilty.

*Id.* at 645.

■ The imposition of a pretrial restraining order freezing the assets of the defendant that the government believes are subject to forfeiture may well have the practical effect of rendering the defendant indigent. However, this possibility does not, when it occurs, constitute a denial of the defendant's absolute sixth amendment right to counsel. While a defendant whose entire assets are subject to a restraining order will not be able to retain counsel of choice, he has the right to have counsel appointed. *See United States v. Ray*, 731 F.2d 1361, 1366 (9th Cir.1984); *United States v. Badalamenti*, 614 F.Supp. 194, 197 (S.D.N.Y.1985). Appointed counsel must, of course, be competent in the constitutional sense. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although we expect that, in making such appointments district courts will make every effort to appoint counsel experienced in complex criminal litigation, it must be acknowledged that appointed counsel may not always be able to offer the defendant the depth of experience or the range of investigative services that counsel of choice may have been able to provide. However, this contingency does not render infirm the forfeiture statute. Lack of economic resources often requires individuals to settle for a mode of professional service other than the one they would retain if expense were no object. One cannot spend money one does not have and, by virtue of the forfeiture provision and the restraining order, the funds in question are not the defendant's to spend.

### 3. The Due Process Issue

We turn to Orlando's second contention that the district court's issuance of a restraining order without holding an immediate postrestraint hearing violated his fifth amendment right to due process. The fifth amendment provides that a person may not be deprived of his life, liberty, or property without due process of law. Thus, we must decide first whether Orlando suffered a deprivation of life, liberty, or property, and second whether that deprivation occurred without due process of law.

#### a.

■ We think it is clear that Orlando suffered a deprivation of property in the constitutional sense. Although the government's title is not established definitively until the entry of a judgment of conviction, title shifts, through the operation of the relation back provision,[20] at the time of the commission of the crime. The restraining order thus operates to remove the assets from the control of the defendant on the claim of the government that it has a higher right to those assets. While the restraining order does not divest definitively the ownership rights of the defendant, it certainly does remove those assets from his

---

**20.** The relation back provision, codified at § 853(c) of title 21 of the United States Code, provides that:

> All right, title, and interest in property described in subsection (a) of this section *vests in the United States upon the commission of the act giving rise to forfeiture under this section.* Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(c) (Supp. IV 1986) (emphasis supplied).

immediate control and therefore divest him of a significant property interest. Accordingly, we must decide whether the method of removal is consonant with the requirements of the due process clause.

b.

■ Due process requires that a person not be deprived of his property without notice and opportunity for a hearing. *See Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). To determine what process is due in a particular setting, we must consider three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural prerequisites would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–43, 105 S.Ct. 1487, 1493–94, 84 L.Ed.2d 494 (1985).

We turn first to the private interest that is affected in this case. The interest at stake here is Orlando's interest in retaining counsel of choice. As we have noted already, this right is hardly an absolute one. On the other hand, the right also can be very significant. Staging a defense against a complex criminal charge is not an easy, nor an inexpensive, matter. It requires counsel skilled in marshalling complicated facts as well as learned in legal principles. It often involves dealing not only with the government but with many codefendants whose interests are not compatible and oftentimes overtly adverse. It also often involves significant investigative resources. As the Fourth Circuit noted:

> Post-indictment restraining orders of the kind authorized by the Act and as actually entered in Harvey's case obvi-

ously may work a tremendous hardship on accused persons. Stripped of all or major portions of his financial resources, an accused (unless in detention) may be unable pending and throughout trial to provide for the basic necessities of life and whether or not in detention, to provide for the preparation of his legal defense.

*Harvey*, 814 F.2d at 928.

In assessing the nature of the private interest at stake, another factor must be recognized. For some purposes, the freeze imposed by the restraining order may in fact be characterized as "temporary." For instance, pending the outcome of trial, the existence of the freeze will require the defendant to *postpone* the use of the assets subject to the freeze. On the other hand, with respect to attorneys' fees, the freeze operates as a permanent deprivation. The defendant needs the attorney *now* if the attorney is to do him any good. It may be that the defendant retains some use of the funds inasmuch as he is able to secure other credit on the contingency that the assets subject to the freeze will later be available because of a favorable verdict. Assuming *arguendo* that such a contingency is a realistic one,[21] it only partially assuages the *immediate* impact of the freeze on the defendant's ability to retain private counsel. Even if it is conceded that the freeze does not eliminate completely the use of the funds for the purpose of retaining counsel, it certainly diminishes, to a wholly different degree of certitude, the utility of the assets.

■ We next examine the second of the *Mathews* factors: the risk of an erroneous deprivation of the private interest through the procedures used and the probable value, if any, of additional procedural safeguards. The return of an indictment by the grand jury is, no doubt, adequate notification to the defendant of the pending forfeiture action as part of the criminal proceeding against him. However, due pro-

---

**21.** There is some evidence that this occurred in this case. Apparently, Mr. Schwartz, who Orlando initially retained to represent him, *see infra* Part II–C, advised one of the Assistant United States Attorneys that his fee arrangement with Orlando involved the proceeds of loans from third parties. *See* Orlando R.13 at 7.

cess requires that the party who may be deprived of a property right not only be informed of that possibility but also have an adequate opportunity to respond. For the opportunity to be adequate, it must be afforded "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *see also Mathews*, 424 U.S. at 333, 96 S.Ct. at 902; *Fuentes*, 407 U.S. at 80, 92 S.Ct. at 1994; *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). In *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Supreme Court held that the *in rem* seizure of a yacht carrying illegal narcotics without prior notice and a hearing did not violate procedural due process. However, the forfeiture statute at issue in the case provided for an immediate, post-seizure hearing. *Id.* at 665–66 and n. 1, 94 S.Ct. at 2084 and n. 1. The Court held that, under those circumstances, the case presented an " 'extraordinary' situation in which postponement of notice and hearing until after seizure did not deny due process." *Id.* at 680, 94 S.Ct. at 2090 (footnote omitted).

 The statute at issue here does not provide for a post-restraint hearing. Indeed, when the pertinent provision, 21 U.S.C. § 853(e)(1)(A), is contrasted with the section governing preindictment freeze orders, 21 U.S.C. § 853(e)(1)(B), it is clear that Congress did not intend that such a hearing be held.[22] What is, we submit, already clear in the text of the statute is reinforced by the legislative history. The Senate Report notes that:

Paragraph (1)(A) provides that a restraining order may issue "upon the filing of an indictment or information ... and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section." Thus, the probable cause established in the indictment or information is, in itself, to be a sufficient basis for issuance of a restraining order. While the court may consider factors bearing on the reasonableness of the order sought, *it is not to "look behind" the indictment or require the government to produce additional evidence regarding the merits of the case as a prerequisite to issuing a post-indictment restraining order.* Since a warrant for the arrest of the defendant may issue upon the filing of an indictment or information, and so the indictment or information is sufficient to support a restraint on the defendant's liberty, it is clear that the same basis is sufficient to support a restraint on the defendant's ability to transfer or remove property alleged to be subject to criminal forfeiture in the indictment.

In contrast to the pre-indictment restraining order authority set out in para-

---

**22.** Section 853(e)(1)(A), governing postindictment restraining orders, and § 853(e)(1)(B), governing preindictment restraining orders, provide as follows:

(e) Protective Orders

(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) of this section for forfeiture under this section—

(A) upon the filing of an indictment or information charging a violation of this subchapter or subchapter II of this chapter for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section; or

(B) prior to the filing of such an indictment or information, if, after notice to persons appearing to have an interest in the property and opportunity for a hearing, the court determines that—

(i) there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and

(ii) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered:
*Provided, however,* That an order entered pursuant to subparagraph (B) shall be effective for not more than ninety days, unless extended by the court for good cause shown or unless an indictment or information described in subparagraph (A) has been filed. 21 U.S.C. § 853(e) (Supp. IV 1986).

graph (1)(B), the post-indictment restraining order provision does not require prior notice and opportunity for a hearing. The indictment or information itself gives notice of the government's intent to seek forfeiture of the property. Moreover, the necessity of quickly obtaining a restraining order after indictment in the criminal forfeiture context presents exigencies not present when restraining orders are sought in the ordinary civil context. This provision does not exclude, however, the authority to hold a hearing subsequent to the initial entry of the order and the court may at that time modify the order or vacate an order that was clearly improper (*e.g.,* where information presented at the hearing shows that the property restrained was not among the property named in the indictment). *However, it is stressed that at such a hearing the court is not to entertain challenges to the validity of the indictment. For the purposes of issuing a restraining order, the probable cause established in the indictment or information is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based.*

S.Rep. No. 225, *supra,* at 3385–86 (emphasis supplied); *see also id.* at 3396. Whatever may be the precise limits on the authority of the district judge at a hearing pursuant to 21 U.S.C. § 853(e)(1)(A), it is clear that the court may not inquire as to the validity of the indictment and must accept that "the probable cause established in the indictment or information is ... determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based." *Id.* at 3386. It is therefore not open to the defendant to attempt to persuade the court that the government's claim to the property is any less strong than suggested by the government in the indictment which it procured on an *ex parte* basis. While a different legislative intent demonstrating more flexibility on the part of Congress might make our task easier, we cannot change, as Judge Miner points out in *Monsanto,* 852 F.2d at

1411–12, what is so clearly articulated both in the statute and the legislative history.

While the statute does not provide for a postdeprivation hearing, it has been argued that the subsequent criminal trial is an adequate opportunity for the defendant to contest the validity of the restraining order. The Supreme Court's decision in *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency,* 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), seems to lend some support for this proposition. There, the Court held that the government's eighteen-month delay between the seizure of currency pursuant to the Bank Secrecy Act of 1970 and the filing of a civil forfeiture action did not violate the claimant's procedural due process rights. However, in reaching this result, the Court stressed that there was no evidence that the claimant desired early commencement of the civil forfeiture proceeding and that she had never alleged or shown that the delay prejudiced her ability to defend against the forfeiture. *Id.* at 569–70, 103 S.Ct. at 2014–15. In contrast, a criminal defendant without any funds not subject to the restraining order needs the frozen assets to make his case at the criminal trial. Relief not obtained prior to the commencement of the criminal trial simply will not be helpful in securing the assistance of counsel of choice at the criminal trial.

We also must note that the statutory scheme does present a great opportunity for abuse by the prosecutorial arm of the government. It permits the government, on the basis of an *ex parte* application to a grand jury—not a judicial officer—to affect significantly the ability of the defendant to participate in the adversary process of the criminal trial. We, of course, do not presume that those charged with the high responsibility of representing the government of the United States in a criminal proceeding would indulge in such a perversion of the criminal process. However, the constitutional validity of a statutory scheme hardly can turn on such an expectation. The adversary process is the basic framework of the American criminal justice system. It ensures the integrity of the

truth-finding process and "sharpens the presentation of issues...." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). If one party can skew the process to its advantage, the integrity of the entire process is harmed.

It may be argued, and not without some cogency, that the availability of appointed counsel diminishes, at least to some extent, the impact of any untoward government action that might otherwise be destructive of the adversary process. Yet, the fact remains that if the defendant is deprived of assets he otherwise would have, he is deprived artificially of his right to join issue with the government as he chooses. Without access to his resources, his options are limited.

We now turn to the third consideration mandated by the Supreme Court in *Mathews:* the government's interest, including the burdens that additional or substitute procedural prerequisites would entail. Here, we need not conjecture with respect to the burden on the government. Congress has spelled it out in no uncertain terms. Discussing the state of the law prior to the enactment of the present statute, the Senate Report noted that:

> Although current law does authorize the issuance of restraining orders in the post-indictment period, neither the RICO nor CCE statute articulates any standard for the issuance of these orders. Certain recent court decisions have required the government to meet essentially the same stringent standard that applies to the issuance of temporary restraining orders in the context of civil litigation and have also held the Federal Rules of Evidence to apply to hearings concerning restraining orders in criminal forfeiture cases. In effect, such decisions allow the courts to entertain challenges to the validity of the indictment, and require the government to prove the merits of the underlying criminal case and forfeiture counts and put on its witnesses well in advance of trial an order to obtain an order restraining the defendant's transfer of property alleged to be forfeitable in the indictment. Meeting such requirements can make obtaining a restraining order—

the sole means available to the government to assure the availability of assets after conviction—quite difficult. In addition, these requirements may make pursuing a restraining order inadvisable from the prosecutor's point of view because of the potential for damaging premature disclosure of the government's case and trial strategy and for jeopardizing the safety of witnesses and victims in racketeering and narcotics trafficking cases who would be required to testify at the restraining order hearing.

S.Rep. No. 225, *supra,* at 3378–79 (footnote omitted). These considerations, the product of a careful and deliberate judgment of Congress with respect to the need to deal with a very special and particularly dangerous form of crime, require our careful and respectful acceptance. It is not for us to second-guess the legislative branch with respect to the magnitude of the threat, the ineffectiveness of the earlier means of combating that threat, or the effectiveness of the means set forth in the present enactment. Nevertheless, it is our duty to determine whether the means chosen by the legislature are compatible with the principles of due process enunciated by the Supreme Court of the United States. Having set forth the various considerations under the three-part test enunciated in *Mathews* applicable to the statutory scheme at issue in this case, we now turn to that question.

### c.

▮ In our view, the present statutory scheme—allowing no opportunity to place in question the government's allegation that certain property is subject to forfeiture—violates the due process clause when it results in preventing the defendant from using the restrained funds to secure the services of counsel of choice. *Accord United States v. Unit No. 7 and Unit No. 8 of Shop in the Grove Condominium*, 853 F.2d 1445 (8th Cir.1988); *Harvey*, 814 F.2d at 928; *United States v. Crozier*, 777 F.2d 1376, 1383–84 (9th Cir.1985); *cf. United States v. Thier*, 801 F.2d 1463, 1468–69 (5th Cir.1986) (court does not consider the constitutionality of section 853(e)(1)(A) be-

cause "[t]he statute does not on its face or by necessary implication bar [the] minimum due process protections [of Fed.R.Civ.P. 65]"), *modified on other grounds* 809 F.2d 249 (5th Cir.1987).[23] *But see United States v. Draine,* 637 F.Supp. 482, 485–86 (S.D. Ala.1986) (limiting *Crozier* to its facts); *cf. Nichols,* 841 F.2d at 1492 n. 4 and 1505 (without deciding due process issue, court nevertheless holds that "a court does not act 'arbitrarily' when it relies ... on a grand jury indictment to issue a restraining order"); *United States v. Musson,* 802 F.2d 384, 386 (10th Cir.1986) ("the reliance of the district court upon the grand jury indictment in issuing a restraining order which restricted free alienation of the subject property" did not violate due process). The interest of the defendant in utilizing the funds in order to conduct a defense, coupled with the unchecked possibility of prosecutorial abuse, outweigh the articulated need for this extraordinary power by the government.

■ We stress, however, the very limited degree to which we find the present statutory scheme constitutionally infirm. We deal only with a situation where the defendant presents a bona fide need to utilize assets subject to the restraining order to conduct his defense. If the district court finds that the defendant does not have other assets from which such payments can be made, it then must require the government to demonstrate the basis for its assertion, contained in the indictment, that the assets are subject to forfeiture. However, if the government elects not to disclose sufficient information to justify its retention of all of the assets subject to the freeze order, then the court must

order the release of funds in an amount necessary to pay reasonable attorneys' fees for counsel of sufficient skill and experience to handle the particular case. Where such an order is entered, we stress that the district court, exercising its authority pursuant to 21 U.S.C. § 853(e), has a continuing obligation to scrutinize carefully the amount of attorneys' fees in order to avoid lavish fees or improper payments to the attorney. Of course, the district court's determination of what constitutes "reasonable" fees is subject to review on appeal.[24] By following this approach, the court's intrusion into the balance mandated by Congress is limited to the degree necessary to accommodate the particular demands of due process required by the request for attorneys' fees.

#### d.

■ In this case, the district court did not require the government to establish the sufficiency of the factual basis for its assertion that the funds subject to the restraining order eventually would be forfeited to the United States. Nor did the court determine whether Orlando in fact had funds not subject to forfeiture with which to pay his counsel of choice. However, under the circumstances of this case, these omissions did not deprive Orlando of his due process rights. The district court made available to Orlando what it believed to be a sufficient sum to permit the retention of an attorney of adequate experience and learning to conduct Orlando's defense. Moreover, the court made clear that it would permit additional funds to be released from the order if, at any point, it

---

**23.** In *United States v. Thier,* the Fifth Circuit held that the forfeiture statute should be read to permit an exemption for attorneys' fees. 801 F.2d 1463, 1470 (5th Cir.1986), *modified,* 809 F.2d 249 (5th Cir.1987). This ruling was reaffirmed in *United States v. Jones,* 837 F.2d 1332 (5th Cir.1988). However, the Fifth Circuit has granted rehearing en banc in the *Jones* case, *see United States v. Jones,* 844 F.2d 215 (5th Cir. 1988), and its decision is presently pending.

**24.** We note that the issue of whether the $40,000 allotted by the district court in this case was a reasonable fee is not before us. The district court specifically stated that it would consider

allowing more than $40,000 to be exempted from forfeiture to pay attorneys' fees if, at some point later in the proceedings, it determined that a higher fee was appropriate. The district court never made a final decision on the matter because Mr. Cagney withdrew as Orlando's representative in the case prior to trial. We do not think that the district court erred in deferring final resolution of the amount to be exempted under the reasonableness standard until after trial. Because Mr. Cagney never gave the district court the opportunity to decide this question, the issue is now moot.

became obvious that the foregoing estimate was incorrect. We believe that the district court's order appropriately accommodated Orlando's right to adequate funds to secure private counsel and the court's continuing obligation to give effect to the will of Congress when there is no compelling due process concern to the contrary.

### 4. Conclusion

In conclusion, we hold that application of the criminal forfeiture statute to include fees paid to an attorney does not violate the qualified sixth amendment right to counsel of choice. However, we also hold that the pretrial, postindictment restraint of a defendant's assets without affording the defendant an immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture violates the due process clause to the extent that it actually impinges on the defendant's qualified sixth amendment right to counsel of choice. If the government seeks to restrain a defendant's assets without subjecting itself to a due process hearing of the type described above, and if the district court finds that the defendant has no other assets with which to hire his attorney of choice, then the government must consent to the exemption of reasonable attorneys' fees, as determined by the district court in its supervisory role, from the property otherwise subject to forfeiture.

### B. *Waiver of Counsel*

We next consider whether the district court erred in permitting Orlando to proceed *pro se*. Orlando asserts that he did not knowingly, intelligently, and voluntarily waive his sixth amendment right to counsel. For the reasons that follow, we disagree.

#### 1. Requirement of a Knowing and Intelligent Waiver

##### a.

■ It is well established that a defendant has a right to conduct his own defense in a criminal case. *Faretta v. California,*

422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, before permitting a defendant to exercise this right, the district court must ensure that he knowingly and intelligently waived his sixth amendment right to counsel:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, *in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits.* Johnson v. Zerbst, 304 U.S., [458] at 464–465 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461] [1938]. Cf. *Von Moltke v. Gillies,* 332 U.S. 708, 723–724 [68 S.Ct. 316, 323, 92 L.Ed. 309] (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. [269], at 279 [63 S.Ct. 236, 242, 87 L.Ed. 268] [1942].

*Id.* at 835, 95 S.Ct. at 2541 (emphasis supplied). The Supreme Court recently has reemphasized the need for strict safeguards before permitting a defendant to waive his right to counsel. In *Patterson v. Illinois,* —— U.S. ——, 108 S.Ct. 2389, 2398, 101 L.Ed.2d 261 (1988), the Court addressed the question of what "type of warnings and procedures ... should be required before a waiver of [the Sixth Amendment] right [to counsel] will be recognized." The Court said that its approach to the waiver question was a pragmatic one that asks "what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage." *Id.* The Court further explained:

> At one end of the spectrum, we have concluded there is no Sixth Amendment right to counsel whatsoever at a postin-

dictment photographic display identification.... At the other extreme, recognizing the enormous importance and role that an attorney plays at a criminal trial, *we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him [to] waive his right to counsel at trial.* See *Faretta v. California*, 422 U.S. 806, 835–836, 95 S.Ct. 2525, 2541–2542, 45 L.Ed.2d 562 (1975); cf. *Von Moltke v. Gillies*, 332 U.S. 708, 723–724, 68 S.Ct. 316, 323–324, 92 L.Ed. 309 (1948).

*Id.* (emphasis supplied). Thus, *Patterson* makes clear that, because of the importance of an attorney at the trial stage, "a more searching or formal inquiry" is required before a waiver can be found. *Id.*

■ The Supreme Court has not yet defined precisely the extent of the *Faretta* inquiry. *But cf. Von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948) (plurality opinion of Black, J.) ("To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter."). The issue has been addressed, however, by several courts of appeals, including our own. See *McMahon v. Fulcomer*, 821 F.2d 934, 945 (3d Cir.1987); *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 478, 98 L.Ed.2d 492 (1987); *United States v. Mitchell*, 788 F.2d 1232, 1235–36 (7th Cir.1986); *McQueen v. Blackburn*, 755 F.2d 1174, 1177 (5th Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985); *United States v. Welty*, 674 F.2d 185, 188 (3d Cir.1982); *United States v. Trapnell*, 638 F.2d 1016, 1029 (7th Cir. 1980). In *Mitchell,* this court attempted to provide some guidance to the district courts on the question:

The district court could have conducted a much more thorough and extensive inquiry of Mitchell by asking Mitchell his age and degree of education; informing him of the crimes with which he was charged and the maximum possible sentences; determining that Mitchell understood the nature of the charges; ascertaining that he had copies of the Federal Rules of Evidence and the Federal Rules of Criminal Procedure and instructing him to read them and to abide by them, whether read or not; and telling Mitchell that he would be expected to conduct himself in accordance with those rules. 788 F.2d at 1236 n. 3.[25] The "trial judge need not give 'a hypothetical lecture on criminal law.'" *Id.* at 1235 (quoting *Arnold v. United States*, 414 F.2d 1056, 1058 (9th Cir.1969), *cert. denied*, 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514 (1970)). However, the court should question the defendant in an effort to demonstrate the difficulties he would encounter in acting as his own counsel and specifically should advise the defendant that it would be unwise not to accept the assistance of counsel. *See Faretta*, 422 U.S. at 835–36, 95 S.Ct. at 2541–42. "[W]hether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

■ Several courts have noted that the district court often is placed in a difficult position when a defendant announces that he wants to represent himself at trial. On the one hand, a defendant has a constitutional right to represent himself, and on the other hand, the court has a constitutional duty to ensure that the defendant only represents himself with full awareness that the exercise of that right is fraught with dangers. No matter what decision the district court ultimately makes—whether to honor the defendant's request or to deny it—the defendant is

---

**25.** While we do not wish to impose an inflexible, ritualistic requirement, we note that guidelines for the appropriate inquiry are set forth

for easy reference in 1 *Bench Book for United States District Court Judges* § 1.02 (Federal Judicial Center 1986).

likely to appeal. *See Tuitt v. Fair,* 822 F.2d 166, 174 (1st Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987); *McDowell,* 814 F.2d at 248; *United States v. Dujanovic,* 486 F.2d 182, 185 (9th Cir.1973). When the district court permits the defendant to proceed *pro se,* the appeal, like the one presently before this court, inevitably will focus on whether the court adequately informed him of the dangers and disadvantages of self-representation. To insulate itself from this kind of attack, we think it advisable that the district court, as a matter of course, conduct a formal inquiry in which the defendant is informed fully of the risks or proceeding *pro se* and explicitly advised against self-representation.

 Although we stress the need for a thorough and formal inquiry as a matter of prudence and as a means of deterring unfounded claims on appeal, we shall not reverse the district court where the record as a whole demonstrates that the defendant knowingly and intelligently waived his right to counsel. *See Mitchell,* 788 F.2d at 1235. "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023. The majority of courts that have considered the issue agree that the ultimate question is not what was said or not said to the defendant but rather whether he in fact made a knowing and informed waiver of counsel. *See Stano v. Dugger,* 846 F.2d 1286, 1288 (11th Cir.1988); *Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1065 (11th Cir.1986); *McQueen,* 755 F.2d at 1178; *United States v. Kimmel,* 672 F.2d 720, 722 (9th Cir.1982); *United States v. Weninger,* 624 F.2d 163, 167 (10th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *see also McDowell,* 814 F.2d at 248–49 (court bases decision on entire record but invokes supervisory power to require district courts to conduct the appropriate inquiry in the future); *United States v. Bailey,* 675 F.2d 1292, 1301 and n. 13 (D.C.Cir.) (same), *cert. denied,* 459 U.S.

853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982). *But see McMahon,* 821 F.2d at 946 (absent an inquiry, court has no way of assessing whether the defendant's decision to represent himself was made knowingly and intelligently); *Welty,* 674 F.2d at 189 (same).

### b.

 We now consider the record in this case to determine whether it clearly establishes that Orlando knowingly and intelligently waived his right to counsel. The first factor we consider is whether the district court conducted a formal inquiry. In this case, Orlando's decision to proceed *pro se* was communicated to the district court at the October 27, 1986 hearing. On November 4, 1986, the district court held another hearing to consider Orlando's decision to proceed *pro se.* The following colloquy between the district court and Orlando took place:

THE INTERPRETER [for Orlando]: Yes. I remember, Your Honor, that you asked me if I wanted a court appointed attorney and I also remember telling you that if I couldn't get Mr. Cagney I would proceed and represent myself.

THE COURT: Is that what you still want to do here?

THE INTERPRETER: It is my great desire that Mr. Cagney would represent me. But if your decision is no, then I will proceed on my own.

I asked him if he still wants to reinforce the decision to represent himself and he says I really don't know at this point.

There's confusion, he says, in my head. But I am explaining to him that your decision was Mr. Cagney was not amenable to the fees and—

Again, I am reiterating that you have limited Mr. Cagney's fees and for that reason Mr. Cagney cannot represent me and I told you that I would represent myself.

THE COURT: But you do understand that I would appoint a lawyer to represent you if you wanted one in this case.

It wouldn't be Mr. Cagney, it would be somebody else. You do know that?

THE INTERPRETER: I would like to have my attorney of my choice, the one I had chosen. I would not like to have an attorney who has never handled a CCE or criminal enterprise without any experience to represent me in this proceeding. You understand that I'm looking at life imprisonment. This is a very serious charge. If I cannot have Mr. Cagney, then on the 17th of November I will be in court to represent myself.

THE COURT: I want you to know, Mr. Estevez, that if I gave you a lawyer here, appointed a lawyer, it would be a good lawyer, an experienced lawyer who might be able to help you in this case and think of things to do that would help you in this case. Do you understand that?

THE INTERPRETER: I understand that you can appoint a lawyer for me. I am very courteous to you and say thank you. But again I'm saying I have my own attorney and I would like to have my own attorney represent me. If he cannot represent me I will represent myself.

Tr. of Nov. 4, 1986 at 5–7. This exchange between the district court and Orlando is unsatisfactory because the thrust of the inquiry was whether Orlando wanted an appointed attorney rather than the disadvantages of self-representation. However, the fact that Orlando was repeatedly advised of his right to have counsel appointed weighs in favor of finding a waiver. *See McDowell*, 814 F.2d at 248. We also note that, although the district court did not itself inform him of such, Orlando clearly understood the nature and seriousness of the charges against him as demonstrated by his statements that he did not want an attorney who lacked experience in CCE

cases, that he was "looking at life imprisonment" and that the CCE charge against him was "very serious." [26] Tr. of Nov. 4, 1986 at 6.

A formal inquiry in which Orlando was warned of the dangers and disadvantages of self-representation *was* conducted by the two Assistant United States Attorneys who were prosecuting the case. The following colloquy took place:

MR. WAGNER [Assistant United States Attorney]: I think Mr. Estevez ought to know that during the course of the trial in front of a jury that there are very technical rules of evidence which limit what the jury can or cannot hear. And that without an attorney who understands the rules of evidence that he will have difficulty in objecting and keeping evidence out from the jury's attention. Do you understand?

THE INTERPRETER [for Orlando]: I am not totally confused. And then, of course, that's, the translation was there. And you know he's not an attorney, so—

MR. KLUMB [Assistant United States Attorney]: You understand I think Mr. Estevez should know that there are two types of evidence that are going to come before the jury. Documents and witness testimony. Sometimes the Court, the Judge will decide that the jury should not be able to view a piece of paper or hear testimony from a certain witness. Sometimes the law does not allow the jury to consider certain things.

Unless you are a lawyer and have been trained in the law it is unlikely that you will be able to object and ask the Judge not to let the jury hear certain things from the witnesses or from the documents. Do you understand that?

THE INTERPRETER: Now I can compare one thing with another.

---

**26.** In his brief, Orlando argues that not only did the district court fail to inform him of the dangers of self-representation, but in fact the court misled him as to the complexities of the case. *See* Orlando's Br. at 42. Orlando refers to the district court's comment that: "The law really isn't very complicated here, Mr. Estevez. This is a drug case where you're charged with being a drug dealer. Simple as that." Tr. of Nov. 4, 1986 at 19. Although this comment may have been inappropriate, we note that it was made after Orlando already had decided to proceed *pro se* and was in response to his subsequent request to have access to a law library. As such, the comment did not have the effect of encouraging Orlando to forego counsel or otherwise affirmatively misleading him into that decision, nor do we think that the district court intended it as such.

There's some confusion. Those are legal terminology and I am not able to understand them. I would like some further explanation. I want to clearly understand.

MR. KLUMB: Okay. Mr. Estevez, the reason that you don't understand what I'm talking about apparently is because you're not a lawyer.

THE INTERPRETER: For that reason I wanted my own attorney.

MR. KLUMB: And if you accepted an attorney appointed by the Court or hired another attorney for $40,000 or less that attorney could help you understand.

THE INTERPRETER: The only thing I can say I would still like to have my own attorney.

MR. KLUMB: Do you understand that because you do not understand the law very well that you will be at a great disadvantage during the trial.

THE INTERPRETER: That was the Judge's decision, not mine.

MR. KLUMB: I'd like him to answer the question. If he understands that because he is not a lawyer he will be at a great disadvantage during the trial.

THE INTERPRETER: I know I am at a disadvantage. I believe that I will be.

*Id.* at 8–10.

The fact that the government's attorneys did attempt to warn Orlando of the problems he would encounter in trying to represent himself weighs in favor of finding a waiver. We also are impressed that Orlando explicitly acknowledged that he knew that he would be at a disadvantage. However, we are disturbed by several aspects of the *Faretta* inquiry in this case. Most notably, we think it was inappropriate for the district court to have delegated its duty to ensure that Orlando knowingly and intelligently waived his right to counsel to the prosecuting attorneys. "It is the solemn duty of *a federal judge* before whom a defendant appears without counsel to make a thorough inquiry and to take all steps necessary to insure the fullest protection of this constitutional right at every stage of the proceedings." *Von Molte,* 332 U.S. at 722, 68 S.Ct. at 322 (emphasis supplied); *see also Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023 (the *trial judge* bears the "serious and weighty responsibility ... of determining whether there is an intelligent and competent waiver by the accused"). This duty should not be discharged by enlisting the defendant's adversary to conduct the waiver inquiry. *Cf. Von Moltke,* 332 U.S. at 725, 68 S.Ct. at 324 ("The Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be."). Thus, although some attempt to inform Orlando of the dangers and disadvantages of self-representation was made in this case, the manner in which it was done weighs against a finding of waiver.[27]

We also are troubled by the rather perfunctory way the entire November 4, 1986 hearing was handled. Because the district court obviously considered its duty under *Faretta* less seriously than it ought to have, the scope of the inquiry conducted on November 4, 1986 was less than ideal. The same comment applies to the prosecuting attorneys, who bore a special duty, by virtue of the district court's delegation of authority, to discuss the problems inherent in self-representation more fully with Orlando. We once again remind the district courts not to take lightly the necessity of conducting a formal inquiry. As one court has said, "the fact of central concern to the Supreme Court is awareness by the defendant of 'the dangers and disadvantages' attendant upon [the course of self-representation]. The most certain assurance of that awareness is by a colloquy on the record

---

**27.** However, we do not think the error is *per se* reversible. Orlando argues that the error is reversible because it gave the government an unfair advantage. He contends that the government could use the opportunity to indulge in cross-examination that would otherwise be impermissible under his fifth amendment right to silence. An examination of the record, however, demonstrates that the Assistant United States Attorneys confined their questions to the hazards of self-representation. At no time did they attempt to elicit incriminating statements or otherwise violate Orlando's right to remain silent.

between judge and defendant." *Baily,* 675 F.2d at 1300. Thus, the perfunctory nature of the questioning and the limited scope of the inquiry also weigh against finding a waiver in this case.

A second factor to consider in deciding whether there has been a valid waiver is whether other evidence in the record establishes that the defendant in fact understood the dangers and disadvantages of self-representation. In this case, there is such evidence. At the October 27, 1986 hearing, Mr. Cagney represented to the district court that he had "tried to explain to [Orlando] some of the pitfalls to [self-representation]." Orlando R. 25 at 26. Additionally, Orlando regularly made references to his legal disability throughout the proceedings. Orlando's own admissions, coupled with Mr. Cagney's statement that he had warned Orlando of the risks involved, weigh heavily on the side of finding a waiver.

A third factor to consider is the background and experience of the defendant. The district court did not specifically question Orlando about his background. However, the record indicates that Orlando was no stranger to the criminal justice system with a prior felony conviction for fraud as well as "numerous contacts with the law in connection with related offenses." Tr. of Apr. 13, 1987 at 4. This factor weighs in favor of finding a waiver.

A fourth factor, and one that turns out to be very important in this case, is the context of the defendant's decision to proceed *pro se. See McQueen,* 755 F.2d at 1177 (court should consider the stage of the proceedings and the setting in which the waiver is advanced). On this point, we note the following facts. At the October 27, 1986 hearing, Mr. Cagney told the district court that Orlando would have to proceed *pro se* in order to preserve his rights on the issue of attorneys' fees. Mr. Cagney said:

What I would ask the Court to do then, if it is then unwilling to revise its order, *is to allow Orlando Estevez to preserve his rights until that issue's been reviewed [on appeal]* so he's not in the position that he is now going to be forced to take should the Court not grant a stay on its order.

*And, that is, that he'll have to proceed pro se* with the Court,....

Orlando R. 25 at 20 (emphasis supplied). Mr. Cagney further explained:

[Orlando would] rather have private counsel. He would rather be able to hire me....

*But without that, Your Honor, he has decided that he would proceed without a lawyer then....* [H]e sees this as the halls of justice, so to speak, is winding down on him. Is basically if you can't have your own lawyer we're just telling you what's going to happen to you and it's all going to happen in a matter of time any way. *And he says I might as well represent myself under those circumstances.*

*Id.* at 26 (emphasis supplied). Orlando expressed his unequivocal agreement with Mr. Cagney on this point, as demonstrated by the following colloquy:

THE COURT: Okay. Now, Mr. Estevez, I'm going to be talking to you. Right now Mr. Cagney is out of this case as far as I'm concerned. He does not represent you and I will not permit him to represent you on the basis of what he has just told me. You understand is [sic] that?

THE INTERPRETER [for Orlando]: Yes.

THE COURT: So you have a choice to make here, because he's not going to represent you on the ground rules I've established. You may have a lawyer that I will appoint to represent you, be a lawyer from the Milwaukee area that I will appoint to represent you and be your lawyer during the trial of this case. If you do not want that, I will ask you to represent yourself in this case and not have a lawyer.

So the choice is yours. Do you want me to appoint a lawyer to represent you or do you want to handle this case without a lawyer?

THE INTERPRETER: I am saying, Your Honor, that if the amount that is

not being granted to Mr. Cagney to represent me, *that I do not wish to have another attorney in the entire United States to represent me if money is not available to Mr. Cagney to be my personal representative.*

THE COURT: Okay. Do you understand that only up to $40,000, if you pay him any more, that is found at a later time to be the result of drug dealing, that money would not be allowed to be kept·by the attorney? Do you understand that?

THE INTERPRETER: *I understand perfectly well.* And I do not understand how a man like Mr. Cagney can carry out a CCE defense with the amount of $40,-000, that possibly $40,000 would not be enough to even pay his personal secretary to type any of the motions that he would have before this Court.

THE COURT: Okay. Then, Mr. Estevez, you do not, you want to represent yourself in this case, is that correct?

DEFENDANT MENELAO ESTEVEZ: Yes, Your Honor.

*Id.* at 42–43 (emphasis supplied).

We think the record is clear that Orlando's decision to proceed *pro se* was in response to the district court's resolution of the attorneys' fees question. Several courts have relied on the manipulative or strategic nature of a defendant's decision to represent himself in finding a waiver of counsel. *See Fitzpatrick,* 800 F.2d at 1067 ("Another factor that is important in this case is whether the defendant was attempting to delay or manipulate the proceedings. Evidence of manipulation or intentional delay implies a greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial." (citations omitted)); *McQueen,* 755 F.2d at 1178 (where the defendant was "cautioned that no replacement counsel would be appointed," his insistence on the third day of trial that his present counsel be removed from his defense "was the functional equivalent of a knowing and intelligent waiver of counsel"); *Weninger,* 624 F.2d at 167 (where the defendant "strategically chose to appear *pro se,*" his "stubborn failure to

hire an attorney constituted a knowing and intelligent waiver of the right to assistance of counsel"). *But see Welty,* 674 F.2d at 189 ("even well-founded suspicions of intentional delay and manipulative tactics can provide no substitute for the inquiries necessary to protect a defendant's constitutional rights").

■ Although we think the record clearly supports the view that Orlando's decision to proceed *pro se* was a tactical one, we note that the situation would be different if Orlando honestly thought that he had to take this course in order to preserve for appeal the forfeiture issue relating to attorneys' fees. *See Tuitt,* 822 F.2d at 177–79 (addressing question whether the trial court's insistence that the defendant expressly waive his right to counsel before being permitted to proceed *pro se* erroneously led the defendant to believe that he was being required to relinquish his objection to the court's denial of his motions to discharge his attorney and for a continuance to secure new counsel). If Orlando was under this misapprehension, then clearly his waiver of counsel was not made knowingly and intelligently. We note that Mr. Cagney's statements may be interpreted as manifesting a belief that proceeding *pro se* was necessary to preserve the issue. *See* Orlando R.25 at 20 (where Mr. Cagney stated that Orlando would have to "preserve his rights" by proceeding *pro se* ). However, these statements also simply may manifest a litigation tactic to bolster his argument on the forfeiture question. In any event, we must consider the possibility that Mr. Cagney misled Orlando about his rights in order to force a decision by either the district court or this court on the forfeiture question. We recognize the obvious potential conflict between Mr. Cagney's interest in his fee and Orlando's interest in being represented by counsel at trial. In fact, Mr. Cagney was very candid on this point. He told the district court:

When you get into the problem in an individual case of trying to compromise the issue of attorneys fees unfortunately you get the attorney in a conflictual situation. I would be less than candid with

the Court if I were to say that my fees weren't very important to me in the case. If you were to ask me to put on the balance of justice evenly between the fees and my client's future and freedom it would seem to be an idealistic concept to answer his freedom is more important than the fees.

Tr. of Sept. 30, 1986 at 30.

However, after examining the record carefully, we conclude that there is no evidence that Orlando's decision to proceed *pro se* in fact was the product of his misunderstanding of his rights on appeal. Orlando's statements on the representation issue repeatedly emphasized that his reason for choosing self-representation was that he could not have Mr. Cagney represent him. For instance, at the October 27, 1986 hearing, he emphatically stated that he did "not wish to have another attorney in the entire United States to represent" him. Orlando R.25 at 42. And, on the morning of trial, in response to the district court's offer of court-appointed counsel, he stated: "I consider it an appointment made by the Court and paid by the Court, perhaps would find it a conflict between the government and myself." Tr. of Nov. 17, 1986 at 25. He also repeated his belief that a court-appointed attorney would not be experienced enough to represent him and that he needed an attorney like Mr. Cagney "to protect myself against any action taken by the government." *Id.*

Obviously, Mr. Cagney played a large role in the way Orlando proceeded. For instance, it appears from the record that Mr. Cagney's participation in the case did not end with the district court's October 27 order on the question of attorneys' fees. The district judge stated at one point toward the end of trial that he personally had seen Mr. Cagney in the building during trial on at least one occasion, and also intimated that Orlando had had Mr. Cagney's help in preparing several motions. *See* Tr. of Dec. 10, 1986 at 1772. In addition, Judge Evans received a request from Mr. Cagney through another attorney who represented Orlando's brother, Omar Estevez, that he [Judge Evans], "in effect, give some indication about how [he] was reading

the case." *Id.* Judge Evans understandably was disturbed by this *ex parte* contact and stated on the record that:

> Mr. Cagney isn't the attorney of record at this time as far as Mr. Estevez is concerned and I'm not going to consider anything that he has to say. In the event that Menelao Orlando Estevez is convicted by this jury on any of the counts against him, I intend to use whatever resources may be available to me to figure out just what has been going on regarding what I perceive to be a Shakespearean Edwardian lawyer in waiting during the trial of this case, the advice, if any, that's been conveyed, the tactical reasons that, for one reason or another, Mr. Cagney has proceeded as he has proceeded here.

*Id.* at 1773. Orlando denied that he had received any help from Mr. Cagney or from any other attorney. *See* Tr. of Dec. 11, 1986 at 1779–81. In addition, Mr. Cagney submitted an affidavit in which he stated that he had not assisted Orlando in preparing his defense. R.47 at 1. Mr. Cagney also stated in the affidavit that he had only been in the courthouse once during Orlando's trial and that his purpose for being there was to attempt to negotiate a plea agreement on Orlando's behalf. *Id.* at 2. The district court never followed up on its expressed intention of investigating further Mr. Cagney's involvement in the case after his withdrawal from representing Orlando. Thus, the court's statements on December 10, 1986, and Mr. Cagney's affidavit filed in response to those statements, are the only evidence in the record on the matter.

Nevertheless, the record demonstrates that, despite the district judge's apparent passivity at the November 4, 1986 hearing and failure to conduct an inquiry into the matter after trial, he actively pursued and monitored the situation during the proceedings. There is no indication in the record that Orlando was confused about his rights. On the morning of trial, the district judge clearly set forth his view that Orlando was an active participant in

Mr. Cagney's strategy, whatever that might have been. The court stated:

> The second matter regarding his attorney, we've made a long record in this case on Mr. Estevez's representation. I have issued a decision in the case. It was Mr. Estevez's desire to not take advantage of the offer I made to appoint lawyers to represent him. He didn't want any. Mr. Cagney did not apparently want to take the case based on the order that I've issued.

Tr. of Nov. 17, 1986 at 24. The next day, the district judge again indicated that he believed that Orlando's decision to proceed *pro se* was premeditated and revolved around the forfeiture question. The court stated:

> I've completely made a record on what my position is on this. And as far as I'm concerned Mr. Menelao Orlando Estevez made a decision after reviewing everything to proceed in this case without a lawyer.

Tr. of Nov. 18, 1986 at 119. This explicit finding by the district court, which had the opportunity to assess by its sustained observation the demeanor of the participants, is entitled to our deference. We think the record shows that Orlando made a calculated choice. While we are mindful of the Supreme Court's admonition that "[t]o preserve the protection of the Bill of Rights for hardpressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights," *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942), we cannot ignore the district judge's view that Orlando's insistence that only Mr. Cagney was qualified to represent him was in reality an attempt to create grounds for reversal of his conviction on appeal. Accordingly, while certain factors weigh against a finding of waiver in this case, on balance we are satisfied that the record as a whole demonstrates that Orlando knowingly and intelligently waived his sixth amendment right to counsel.

### 2. Requirement of a Voluntary Waiver

Orlando also argues that his decision to represent himself was not a voluntary one [28] in the sense that the only reason he did so was the fact that the district court "blocked Mr. Cagney" from representing him. Orlando's Br. at 41. While it may be true that Orlando would have preferred to have Mr. Cagney as his counsel, we are unable to say that his decision to represent himself thereby was rendered involuntary. A voluntary decision to waive counsel is not necessarily one that is entirely unconstrained. A criminal defendant may be asked to choose between waiver and another course of action as long as the choice presented to him is not constitutionally offensive. *Mitchell*, 788 F.2d at 1236; *Wilks v. Israel*, 627 F.2d 32, 35–36 (7th Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981); *United States v. Davis*, 604 F.2d 474, 483 (7th Cir.1979); *see also* W. LaFave & J. Israel, *Criminal Procedure* § 11.4(d) at 495 (1984) ("It is not inconsistent with the concept of a voluntary waiver to require a choice between waiver and another option, provided that other option is itself consistent with the protection of [the defendant's] constitutional rights."). In this case, the limitation on Orlando's range of free choice imposed by the district court's fee decision was, as we held in Part II–A of this opinion, a constitutionally permissible one. Orlando may have felt "forced" into his decision, but that decision was nonetheless voluntary.

### 3. Court–Appointed Interpreter

Orlando argues that his waiver of counsel was defective because he was unable to understand the court-appointed interpreter. He asserts that his confusion resulting from the interpreter's translation is evident from the record. Initially, we have serious doubts about whether Orlando even needed an interpreter. At the November 4, 1986 hearing, the district court asked Orlando if he remembered the prior hearing at which Mr. Cagney argued the forfeiture issue.

---

**28.** In addition to being knowing and intelligent, a waiver must also be voluntary. *See Patterson v. Illinois*, ⸺ U.S. ⸺, 108 S.Ct. 2389, 2394 n. 4, 101 L.Ed.2d 261 (1988).

Tr. of Nov. 4, 1986 at 4. Orlando responded, in English, "I don't remember." *Id.* Later, the district court stated in response to Orlando's complaints about the interpreter that "five of the first eight witnesses who testified in this case have said under oath on the witness stand that they have conversed with Menelao Orlando Estevez in English." Tr. of Nov. 24, 1986 at 403; *see also* Orlando R.6 at b, c (Report Commencing Criminal Action in the Southern District of Florida and Commitment Order, both listing Orlando's language as being English); Tr. of Nov. 18, 1986 at 119–20 (district court notes that a deputy sheriff at the jail where Orlando was being held during trial reported that he heard Orlando conversing in English with another inmate).

The district court did not make a finding on whether Orlando could speak and understand English. *See* Tr. of Nov. 18, 1986 at 120. However, a remand to the district court for purposes of making such a finding is not necessary in this case. Matters regarding the use of an interpreter are left to the discretion of the district court. *See United States v. Coronel–Quintana,* 752 F.2d 1284, 1291 (8th Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); *United States v. Anguloa,* 598 F.2d 1182, 1185 (9th Cir.1979); *see also* Fed.R.Crim.P. 28. Orlando has not presented any evidence of the interpreter's incompetence or of his own inability to understand the interpreter other than his unsupported assertions. In contrast to these assertions, at the November 4, 1986 hearing, Orlando stated that he was "very happy with the translation Mrs. Ward is doing," although he also stated that he had some problems understanding certain legal terms. Tr. of Nov. 4, 1986 at 19. Although Orlando requested the district court to appoint a new interpreter on several occasions thereafter, the district court rejected his complaints. The court stated that Mrs. Ward was a certified interpreter, "eminently qualified," and "competent." Tr. of Nov. 7, 1986 at 5. In addition, the district court noted that Mrs. Ward successfully had acted as an interpreter in many other cases and that it saw "no rea-

son ... to change." *Id.* The district court stated that it was "[its] sense ... from asking [Orlando] questions and listening to [Orlando's] responses through the interpreter that she [was] providing [Orlando] with the information properly as an interpreter should and [was] conveying ... [Orlando's] statements very accurately." *Id.* at 5–6. The district court also noted that Mrs. Ward was translating for several of the other defendants, and that no one other than Orlando had complained of a problem in understanding her. When Orlando persisted in his complaints, the district court stated:

> [T]his business about the interpreter is a red herring as far as I'm concerned. This interpreter is doing a marvelous job in my opinion of translating these proceedings here. She has worked in this Court on prior occasions, in the other federal courts in the district, in most of the courts in the Milwaukee County Circuit Court system. She's well respected as a competent interpreter and in my opinion is doing a fine job.

Tr. of Nov. 24, 1986 at 403. The district court was in a much better position than we are to judge whether the interpreter was performing adequately. We are satisfied from our own review of the record that the district court carefully considered Orlando's objections to the interpreter and did not abuse its discretion in rejecting them.

4. Standby Counsel

Orlando submits that his conviction should be reversed because the district court did not appoint him an attorney once it became apparent at trial that he was unable to defend himself. The appointment of standby counsel is a well-recognized safeguard when a defendant elects to proceed *pro se* and one that should be employed on a regular basis. *See Faretta,* 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46 (standby counsel can be appointed even over the defendant's objections); *Welty,* 674 F.2d at 193 n. 5 (" 'Standby counsel should always be appointed in cases expected to be long or complicated or in which there are multiple defendants.' " (quoting

Standard 6–3.7 of the ABA Standards of Criminal Justice, *The Trial Judge's Function* (2d ed. 1980))); *see also McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S.Ct. 944, 946, 79 L.Ed.2d 122 (1984). However, the court's failure to do so is not grounds for reversal. *See Fitzpatrick*, 800 F.2d at 1067; *McQueen*, 755 F.2d at 1178; *Welty*, 674 F.2d at 193 n. 5. In this case, we also note that both before and during trial, the district court regularly reminded Orlando that he would be furnished with appointed counsel if he wished.

In a related argument, Orlando submits that the district court should have intervened once it became apparent at trial that he was incompetent to defend himself. The Sixth Circuit recently addressed a similar claim:

> McDowell's final argument is that the district court committed plain error in not declaring a mistrial *sua sponte* after it became apparent that he was not receiving a "fair trial." The only thing that was "unfair" about McDowell's trial was that he did not represent himself very well.... However, as the Supreme Court stated in *Faretta*, "whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Id.* [422 U.S.] at 834 n. 46, 95 S.Ct. at 2541 n. 46. We think this logic applies equally to preclude the instant "fair trial" claim. The district court accorded McDowell his full constitutional rights at trial.

*McDowell*, 814 F.2d at 251. We agree with the Sixth Circuit's reasoning on this point and see no error in the way the district court handled the matter once Orlando elected to represent himself.

**C. *Continuance***

■ Orlando argues that the district court's denial of his request for a continuance violated his speedy trial rights under section 3161(c)(2) of the Speedy Trial Act. That provision provides that:

> Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days *from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.*

18 U.S.C. § 3161(c)(2) (emphasis supplied). Orlando asserts that the relevant date for purposes of this section is October 27, 1986, the date he decided to proceed *pro se*. It thus was error, under Orlando's view, for the district court to commence trial on November 17, 1986, only twenty-one days later.

Orlando's argument fails because the statute also provides that the thirty-day preparation period begins from the date on which the defendant first appears through counsel. In this case, Orlando first appeared through counsel on September 2, 1986. At that time, attorney Fred A. Schwartz of Miami, Florida filed a Notice of Permanent Appearance as Counsel of Record in the Southern District of Florida on behalf of Orlando. *See* Orlando R. 6 at E.[29] This occurred approximately two and one-half months before Orlando's trial.

■ We reject Orlando's contention that the date he elected to proceed *pro se* rather than the date he first appeared through counsel is the relevant date from which to start counting days. When the defendant first appears through counsel, his later decision to proceed *pro se* should not trigger anew the thirty-day preparation period. To interpret the statute otherwise would enable a defendant to postpone his prosecution by deciding on the even of trial that he wants to dismiss his attorney and

---

**29.** Mr. Schwartz had been privately retained by Orlando after Orlando was arrested in Miami. In addition to filing a Notice of Permanent Appearance as Counsel of Record, in which he certified that his appearance was unlimited, Mr. Schwartz also represented Orlando at a joint removal and detention hearing in the Southern District of Florida held on September 8, 1986. There is nothing in the language of § 3161(c)(2) that requires that the defendant's first appearance through counsel be his first appearance through counsel in the district where charges are pending.

represent himself. *Cf. United States v. Darby,* 744 F.2d 1508, 1520 n. 5 (11th Cir. 1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985). Orlando has not cited any case, and our own research has not found any, where it was held that a district court's refusal to grant a continuance, after permitting the defendant to discharge his counsel and proceed *pro se,* violated section 3161(c)(2) of the Speedy Trial Act.[30]

Although the purpose of section 3161(c)(2) is to guarantee the defendant a minimum of thirty days for the preparation of his defense, "the statute only partially addresses 'Congressional concern' about the adequacy of preparation and ... Congress inevitably relied on the trial judge's discretion to grant a continuance where necessitated by the circumstances of counsel's retention or appointment...." *Id.* at 1520. Orlando does not argue on appeal that the district court's denial of a continuance was an abuse of discretion. However, assuming that implicit in his speedy trial argument is an assertion that the district court abused its discretion, we also reject that claim. The district court's exercise of its discretion in scheduling trials and granting or denying continuances is "almost standardless." *United States v. Rodgers,* 755 F.2d 533, 539 (7th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985); *see also United States v. Davis,* 604 F.2d 474, 480 (7th Cir.1979) ("virtually unreviewable"); *cf. Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." (quoting *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964))).

In this case, the district court made clear very early in the proceedings that it intended to adhere to the trial date that already had been set for November 17, 1986. We are not in the position to second-guess the district court's determination that Orlando's asserted need for additional time to prepare for trial was not outweighed by the additional burden that rescheduling would have placed on the court's docket. *See Davis,* 604 F.2d at 480. Orlando had twenty-one days from his decision to proceed *pro se* until his trial started in which to prepare his defense. He would have had longer if he had not decided to fire Mr. Schwartz and hire Mr. Cagney. Viewing the record as a whole, we cannot say that the district court abused its discretion. *See Rodgers,* 755 F.2d at 540 (no abuse of discretion where new counsel was appointed only two days before trial); *Davis,* 604 F.2d at 480 (no abuse of discretion where newly appointed counsel had two and one-half weeks to prepare for trial).

### D. *Access to Law Library and Other Legal Materials*

Orlando contends that he was denied due process when the district court refused him access to a law library and other legal materials allegedly needed in order to prepare his defense. His motion in the district court requested access to a law library, an interpreter to translate cases into Spanish, a typewriter to prepare motions, and access to other defense attorneys and codefendants to discuss his case

---

**30.** We need not decide whether to adopt the Ninth Circuit's position that a defendant first appears through counsel for purposes of § 3161(c)(2) when he is represented by counsel engaged or appointed to represent him *at trial, United States v. Daly,* 716 F.2d 1499, 1505 (9th Cir.1983), *cert. dismissed,* 465 U.S. 1075, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984), or the Eleventh Circuit's position that § 3161(c)(2) only "'guarantee[s] to the criminal defendant the right to a delay of at least thirty days *between arraignment and trial* in any circumstances,'" *United States v. Darby,* 744 F.2d 1508, 1520 n. 5 (11th Cir.1984) (quoting *United States v. Wooten,* 688 F.2d 941, 951 (4th Cir.1982) (emphasis added)), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2322, 2323, 85 L.Ed.2d 841 (1985). Even under the broader formulation of § 3161(c)(2) espoused by the Ninth Circuit, the thirty-day preparation period begins to run once counsel enters a general appearance on the defendant's behalf. The record clearly reflects that Mr. Schwartz entered a general appearance on Orlando's behalf by notice of appearance filed on September 2, 1986.

with them. *See* Orlando R.30. In addition, he requested that the court provide him with all the evidence in the case and an investigator to interview witnesses. *Id.* On appeal, Orlando argues that a defendant who is proceeding *pro se* has an unqualified right of access to a law library and materials necessary to prepare his defense. Orlando's Br. at 51.

The Supreme Court has held that prisoners have a due process right to adequate, effective, and meaningful access to courts to challenge violations of their constitutional rights. *See Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). This court has held that "this right is possessed not only by convicted prisoners, but by pretrial detainees who are jailed pending trial." *Johnson by Johnson v. Brelje,* 701 F.2d 1201, 1207 (7th Cir.1983) (citing *Lock v. Jenkins,* 641 F.2d 488, 498 (7th Cir. 1981)). Nevertheless, Orlando's claim that he was denied this right to access need not detain us very long. The same contention was rejected in *United States ex rel. George v. Lane,* 718 F.2d 226 (7th Cir. 1983). In *Lane,* we held that "when a defendant (pretrial detainee) is offered the assistance of appointed counsel and refuses the same, no constitutional right exists mandating that the prisoner in the alternative be provided access to a law library should he choose to refuse the services of court-appointed counsel." *Id.* at 227; *see also Howland v. Kilquist,* 833 F.2d 639, 643 (7th Cir.1987); *Johnson by Johnson,* 701 F.2d at 1208; *cf. Milton v. Morris,* 767 F.2d 1443 (9th Cir.1985); *United States v. Wilson,* 690 F.2d 1267 (9th Cir.1982), *cert. denied,* 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983); *United States v. Chatman,* 584 F.2d 1358 (4th Cir.1978).

This case presents us with no special circumstances that would permit our deviation from the holding in *Lane.* This matter was raised by Orlando at the time he rejected, as a calculated effort to secure the services of Mr. Cagney at Mr. Cagney's price, the district court's offer of (1) release of an initial $40,000 from the restraining order to retain private counsel, or (2) appointed counsel. Moreover, as we already have noted, the district court monitored the matter of Orlando's representation throughout the trial. At one point, the court verified that Orlando had copies of all the discovery material given earlier to Mr. Cagney. In addition, the court required that Orlando be given a copy of the indictment, the pertinent section of the United States Code, "[a]nd perhaps Xerox copies of a couple of the later decisions that explain the elements of the charge and so on." Tr. of Nov. 7, 1986 at 6. The court also required that the government supply Orlando with a copy of the government's trial brief. Accordingly, we reject Orlando's due process argument that he was denied access to the courts.[31]

### E. *Sentencing*

Orlando's final argument has merit. On April 13, 1986, Orlando appeared before Judge Evans for sentencing. In imposing sentence, Judge Evans made the following remarks:

I have been troubled by this case ever since it was assigned to me, and I would prefer, much prefer to have this case be on the posture of what I would characterize as a clean case for purposes of sentencing, but this case is not in that particular posture. What I mean by that is because of the representation issue in this case, I feel that rather than the end of the line I am just a step in the process here, and that if the Court of Appeals decides that I was wrong in the decisions I made regarding representation, that some other Judge will have this case again for trial and no doubt sentencing, or just for sentencing.

So, I am moved by that to consider giving whatever other Judge may have a look at this case a great deal of latitude as to what that court might want to do.

---

31. Orlando also asserts that he was denied the services of an interpreter to assist him in translating court documents and filing his own motions. Orlando's assertion is not supported by the record, which indicates that the district court afforded him the opportunity to consult with an interpreter. The district court also invited Orlando to submit his motions in Spanish.

Tr. of Apr. 13, 1987 at 17–18. Thereafter, Judge Evans stated:

> It is very possible that I might see Mr. Estevez again. I have power under Rule 35, of course, to modify sentence that I impose in this case, and I feel really constrained to impose a significant sentence here so that when this underlying issue is resolved either by the Court of Appeals affirming the conviction, the Court of Appeals reversing it, or Mr. Estevez in effect withdrawing his appeal and coming in on a Rule 35 to be resentenced.
>
> *The sentence that I intend to impose, because of this hole in the case, is going to be larger than the sentence I think is appropriate under all the circumstances here, and I want that understood right now.*

*Id.* at 19–20 (emphasis supplied).

■ It is well established that a district court has wide discretion in determining what sentence to impose. *See United States v. Mealy,* 851 F.2d 890, 905 (7th Cir.1988); *United States v. Ryan,* 810 F.2d 650, 658 (7th Cir.1987); *United States v. Sato,* 814 F.2d 449, 451 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987). However, a district court abuses its discretion when it relies on improper criteria in imposing a sentence. " '[A] criminal defendant has a constitutional right to be sentenced on accurate information, and *this court will vacate a sentence if the district court relied on improper factors.' "* *Mealy,* at 905 (quoting *United States v. Cusenza,* 749 F.2d 473, 478 (7th Cir.1984) (citations omitted)) (emphasis supplied); *see also Sato,* 814 F.2d at 452; *United States v. Hoffman,* 806 F.2d 703, 713 (7th Cir.), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1986).

■ The government asserts that although the district judge "initially expressed its concerns over the gamesmanship and trial strategy embarked upon by Attorney Cagney and Orlando," the judge "then indicated that in imposing a sentence, it considered a number of factors." Gov't's Br. at 68. These factors included: (1) a private presentence report prepared by National Legal Services; (2) the defendant's family background in Cuba; (3) the enormous size of the cocaine operation; (4) the sophistication of the cocaine operation; (5) the fact that Orlando was the criminal mastermind behind the organization; and (6) the aura of violence surrounding the organization. Tr. of Apr. 13, 1987 at 21–23. The government argues that we should affirm Orlando's sentence because the district judge clearly gave him individual consideration in imposing sentence and because the sentence imposed was within the statutory limits.

We cannot agree with the government's position. While the district judge did consider other factors, he also explicitly stated that he was imposing a larger sentence than he felt was appropriate. He repeated this statement even *after* he discussed the six factors noted above. *See id.* at 23 ("I will reiterate, I don't feel that I have this case in a posture that I can impose what I think is the appropriate sentence, instead I have to impose almost a provisional sentence...."). We cannot ignore the district judge's clear and unequivocal statements that the sentence he imposed on Orlando was greater than what he thought Orlando actually deserved. In doing so, the district judge relied upon an improper consideration, *i.e.,* future developments in the case. "[T]here are few limitations on the type of information a district court can consider when sentencing a defendant." *United States v. Cusenza,* 749 F.2d 473, 478 (7th Cir.1984). However, the district judge's prognosis of our disposition of the defendant's case on appeal may not be considered. We therefore vacate Orlando's sentence and remand his case for resentencing.

### III

### Appeal of Celestino Orlando Estevez, No. 87–1280

The jury convicted Celestino Estevez of one count of conspiracy to possess cocaine with intent to distribute (count 1), six counts of possession of cocaine with intent to distribute (counts 2, 4, 7, 9, 13, and 14),

and one count of conducting a CCE (count 21). The district court entered a judgment of acquittal on count 2. The court then sentenced Celestino to twenty years imprisonment on the CCE count and fifteen years imprisonment each on counts 4, 7, 9, 13, and 14. The fifteen-year prison terms are to run concurrently with each other and concurrently with the term imposed on the CCE count. The court suspended Celestino's sentence on the conspiracy count.

On appeal, Celestino challenges his convictions on counts 1 and 21. He argues that (1) the evidence was insufficient to prove that he held a supervisory role in the criminal enterprise; (2) the government failed to prove the requisite series of violations necessary to convict under a CCE charge; (3) the CCE count in the indictment was insufficient as a matter of law because it failed to allege the predicate acts in support of the charge; (4) the district court improperly permitted him to be convicted of conspiracy because it is a lesser included offense of the CCE charge; and (5) the district court erred in not granting his motion for severance. We consider each of these arguments *seriatim*.[32]

### A. *Supervisory Role in the CCE*

Celestino's first argument is that the evidence was insufficient to support his conviction on the CCE charge because the government failed to prove that he held a supervisory, managerial, or organizational position with respect to at least five individuals. We first note that Celestino bears a heavy burden on this issue. In reviewing a claim of insufficiency of the evidence, this court "must review all the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680

(1942)). The crucial question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). "An appellate court will not weigh the evidence or assess the credibility of the witnesses." *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986). Thus, " '[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' " *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985) (quoting *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971) (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984))).

### 1.

The CCE statute, codified at 21 U.S.C. § 848, requires proof of five elements: (1) a violation of the federal narcotics laws; (2) which crime is a part of a series of violations of the federal narcotics laws; (3) undertaken by the defendant and at least five other individuals; (4) with respect to whom the defendant holds a supervisory, managerial, or organizational role; and (5) from which the defendant receives substantial income or resources. 21 U.S.C. § 848(d); *Garrett v. United States*, 471 U.S. 773, 781, 105 S.Ct. 2407, 2413, 85 L.Ed. 2d 764 (1985); *United States v. Markowski*, 772 F.2d 358, 360–61 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). Celestino challenges the government's proof on the question of whether he held a supervisory, managerial, or organizational position with respect to at least five other individuals.[33]

**32.** Celestino also argues that his sixth amendment and due process rights were violated by the forfeiture provision of the indictment. We reject Celestino's argument for the reasons stated in note 11, *supra*.

**33.** Celestino made a motion for judgment of acquittal in the district court under Federal Rule of Criminal Procedure 29 in which he argued that the evidence was insufficient to support his CCE conviction. However, rather than argue that the government failed to prove his supervisory or managerial role, he asserted that the government failed to prove that he derived substantial income from the criminal

■ The CCE statute is a "carefully crafted prohibition aimed at a special problem." *Garrett*, 471 U.S. at 781, 105 S.Ct. at 2413. It is commonly referred to as the "kingpin" statute because its purpose is to punish, through severe penalties, "organizers and leaders of narcotics operations." *United States v. Sinito*, 723 F.2d 1250, 1261 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984). However, the term "kingpin" may be somewhat misleading. While the statute was not designed to reach mere "lieutenants and foot soldiers," *Garrett*, 471 U.S. at 781, 105 S.Ct. at 2413, the case law clearly establishes that it does reach individuals who are not the ultimate authority in the drug ring but who nevertheless occupy an organizational, management, *or* supervisory role in the criminal enterprise.

■ "The basic outlines of the disputed management element [of the CCE statute] have been liberally construed." *United States v. Possick*, 849 F.2d 332, 335 (8th Cir.1988). "The statute is written in the disjunctive language, and the government need prove only that the defendant was an organizer, or a supervisor, or held some management role, not all three." *Id.* Furthermore, the terms organizer, supervisor, or manager are to be given their ordinary meaning, *United States v. Wilkinson*, 754 F.2d 1427, 1431 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), and it is irrelevant that other persons may have exercised supervision superior to the defendant's, *United States v.*

*Becton*, 751 F.2d 250, 254–55 (8th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). *See also United States v. Maull*, 806 F.2d 1340, 1343 (8th Cir.1986), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987); *United States v. Losado*, 674 F.2d 167, 174 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). The Eighth Circuit has summarized nicely the nature of the government's burden of proof on this question:

> The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five. *In essence, the management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms.*

*Possick*, 849 F.2d at 335–36 (emphasis supplied) (citations omitted); *see also United States v. Lueth*, 807 F.2d 719, 731–32 (8th Cir.1986); *United States v. Cruz*, 785 F.2d 399, 407 (2d Cir.1986); *Becton*, 751 F.2d at 254–55.

### 2.

■ We now examine the evidence to determine whether it was sufficient to support the jury's finding that Celestino occu-

---

enterprise. We have said that a defendant's failure to file a timely motion for judgment of acquittal constitutes a waiver on appeal of any challenge to the sufficiency of the evidence. We will overlook the waiver only where the defendant demonstrates a manifest miscarriage of justice. *See United States v. Berardi*, 675 F.2d 894, 902 n. 16 (7th Cir.1982); *see also United States v. Carter*, 720 F.2d 941, 947 (7th Cir.1983) (it is not incumbent upon the court to review the sufficiency of the evidence when the defendant failed to renew his motion for judgment of acquittal made at the conclusion of the government's case-in-chief at the close of the trial, after verdict, or within seven days of the jury's verdict as provided for in Rule 29(c)); *United States v. Lopez*, 709 F.2d 742, 746 (1st Cir.) (a defendant's failure to make an appropriate motion for judgment of acquittal constitutes a

waiver preventing the court's review of the sufficiency of the evidence unless the defendant can demonstrate that his conviction was "clearly and grossly unjust"), *cert. denied*, 464 U.S. 861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983); C. Wright, 2 *Federal Practice and Procedure* § 469 (1982). However, the government has not argued on appeal that Celestino waived the sufficiency of the evidence argument with respect to his supervisory role in the CCE. The government therefore has waived Celestino's waiver. *See United States v. Holzer*, 840 F.2d 1343, 1349 (7th Cir. 1988); *United States v. Owokoniran*, 840 F.2d 373, 373–74 n. 1 (7th Cir.1987); *United States v. Tri–No Enters.*, 819 F.2d 154, 158 n. 1 (7th Cir. 1987); *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 663 (7th Cir.1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987).

pied a supervisory, organizational, or managerial position in the criminal enterprise with respect to at least five individuals. We think that it did. The evidence at trial demonstrated a well-organized and hierarchical operation. The central figure in the organization clearly was Orlando Estevez. Orlando's brother, Omar Estevez, was second-in-command. The organization employed five or more individuals outside of the Estevez family, including but not necessarily limited to, Lawrence Jackman, Evilio Pinto, Maria Pinto, Amado Leon, Orlando Carbonell, Rolando Llerena, Adalberto Herrera, and Armando Martinez. Contrary to his assertions, Celestino clearly occupied a role in the operation that was superior to these other individuals. Mr. Jackman testified that when neither Orlando nor Omar Estevez was in Milwaukee, Celestino was in charge. In addition, Mr. Pinto testified that when he owed money to Orlando, he "[s]ometimes ... would pay Celestino and sometimes Orlando" and that it did not "make any difference" because "[t]hey were running the business together." Tr. of Nov. 20, 1986 at 102. Mr. Pinto also stated that he was "in business with Celestino and Orlando," *id.* at 92, and that "Celestino stayed behind to run Orlando's business." *Id.* at 93.

Both Mr. Jackman and Mr. Pinto—Mr. Jackman in particular—were sufficiently high up in the organization to be able to provide an accurate picture of Celestino's role in the organization as a whole. We therefore cannot say that a reasonable jury could not infer from their testimony that Celestino occupied a supervisory role with respect to all individuals in the organization, excluding his two sons. We believe that a reasonable jury could infer from the testimony of Mr. Jackman and Mr. Pinto that Celestino directed and managed the organization as a whole when neither of his two sons was in Miami. We thus think that proof of Celestino's supervisory role in the organization, combined with proof that the organization employed five or more individuals, was, in this case, sufficient to satisfy the management element of the CCE statute. *See Cruz*, 785 F.2d at 407 ("Whether or not Cruz ever met the two

streetcorner sellers, *they clearly operated within an organization that he managed and organized.*" (emphasis supplied)); *United States v. Lewis*, 759 F.2d 1316, 1331 (8th Cir.) (per curiam) ("it is sufficient to sustain the prosecution if the superior works with a total of five participants"; in this case, the defendant "occupied a sufficiently central role to be regarded as holding" a supervisory position *and* "at least five others participated in the enterprise in such a way that they could be said to have fallen under [his] managerial authority"), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *cf. United States v. Tarvers*, 833 F.2d 1068, 1074 (1st Cir.1987) (discussing whether the management element of the CCE statute "refers to five specific persons or simply defines the size of the enterprise," and deciding that the district court need not require unanimity as to the identity of the five subordinates); *Markowski*, 772 F.2d at 364 ("[t]he statute does not make the identity of the five [people who acted under the defendant's supervision] important").

■ Celestino argues that the government must show that he independently exercised authority over five individuals before it can convict him of operating a CCE. He asserts that the government did not offer any evidence of his independent control and supervision and that the jury improperly inferred from his familial relationship with Orlando and Omar that he occupied a supervisory position. The government, on the other hand, argues that the CCE statute does not require that there be proof of independent supervision and that there was sufficient evidence to establish that Celestino occupied a position of control, although he himself was under the supervision of his two sons. We agree with the government that the CCE statute does not require proof that the defendant exercised supervision independent of any other individual's control. "There is nothing in the language of the CCE statute, or the cases applying it, that requires the government to establish that the defendant wielded absolute and exclusive control over

his subordinates." *Possick*, 849 F.2d at 336–37.

In any case, we think that there also was direct evidence from which a reasonable jury could infer that Celestino exercised supervisory authority over five specific individuals. First, the evidence clearly established that Celestino supervised the activities of Lawrence Jackman. Celestino often directed Mr. Jackman to deliver cocaine to prospective buyers. A witness who purchased cocaine from one of Celestino's customers testified that he knew Mr. Jackman as a drug runner who worked for Celestino. "To the extent that the government proves that a person collected money or delivered drugs for the defendant, the court will find that the defendant controlled that person. Sending people to do the actual distribution tasks clearly comes within the meaning of terms supervise, organize, or manage in the CCE." *United States v. Zavala*, 622 F.Supp. 319, 329 (N.D.Cal.1985), *aff'd*, 839 F.2d 523 (9th Cir. 1988), *petition for cert. filed*, Mar. 30, 1988. Moreover, Celestino taught Mr. Jackman how to cut, package, and weigh cocaine. Instructing employees on the skills involved in the trade is one indication of managerial control. *Cf. Possick*, 849 F.2d at 337. When Mr. Jackman went over to a friend's house, Celestino would accompany him "to make sure that [he] wouldn't do anything wrong or run away again like [he] had done previously...." Tr. of Dec. 3, 1986 at 147. The use of coercion to maintain discipline among employees is another factor indicating ability to exercise control over others. *Cf. Possick*, 849 F.2d at 336.

Second, the evidence also clearly established that Celestino supervised or managed Evilio Pinto. Celestino supplied Mr. Pinto with cocaine. On one occasion, Mr. Pinto asked Celestino for three kilograms of cocaine to sell to a customer. Celestino refused to give him the three kilograms all at once and instead told Mr. Pinto that he could only have one kilogram at a time; after Mr. Pinto sold one kilogram and came back with the money, Celestino would give him the next kilogram. Celestino set this deal up while Orlando was in Miami. When Orlando found out about the deal, he instructed Celestino not to go through with it. Celestino nevertheless went ahead with the deal and dispensed the first kilogram to Mr. Pinto, who was arrested while trying to sell the cocaine to an undercover officer. This transaction clearly demonstrates Celestino's supervisory role with respect to Mr. Pinto. "[D]efendants who arrange the acquisition of the drug, its delivery, and set the price and credit terms have been found to fill a ' "sufficiently central role" ' to satisfy the requirements of the management element." *Id.* (quoting *United States v. Grubbs*, 829 F.2d 18, 19–20 (8th Cir.1987) (per curiam) (quoting *United States v. Lewis*, 759 F.2d 1316, 1331 (8th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985))); *see also United States v. Peters*, 791 F.2d 1270, 1290 (7th Cir.) (defendant organized, managed, and supervised the delivery of cocaine to his customers from a number of people), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986).

Third, the evidence also showed that Celestino exercised supervisory power over Maria Pinto, Evilio Pinto's wife. Mrs. Pinto collected money as payment of drug debts for her husband while he was in jail. Later, she received a phone call from either Orlando or Celestino about the money she collected. Orlando and Celestino then went together to her house to get the money from her. On another occasion, Celestino called Mrs. Pinto from jail and asked her to collect money for him. Thus, the evidence showed that Mrs. Pinto worked for her husband, who in turn was directed by Celestino. Mrs. Pinto's testimony also indicated that Celestino exercised some supervisory authority over her directly.

Fourth, a reasonable jury also could find that Celestino supervised Orlando Carbonell. Mr. Carbonell apparently was hired by Orlando to act as Celestino's bodyguard. Celestino sent Mr. Carbonell back to Miami when he became dissatisfied with his services.

Fifth, the evidence was sufficient to establish that Celestino supervised or managed a group of regular customers,

comprised of five or six individuals and referred to as the "south side group." Mr. Jackman testified that the south side group was serviced primarily by Celestino and that the five or six individuals belonging to the group were Celestino's customers. Mr. Jackman testified that, typically, the south side group was not "fronted" cocaine; however, he also testified that Celestino would decide whether to sell more cocaine to a member of the south side group for cash even though that person still had an outstanding balance. Drug ledgers, which were admitted into evidence, revealed outstanding balances in the sum of thousands of dollars for several individuals who were from the south side group. It was Celestino who set up the account books and managed the bookkeeping. Several courts have said that the "fronting" of cocaine alone is insufficient to support finding a management relationship.[34] Nevertheless, as we already have noted, "defendants who arrange the acquisition of the drug, its delivery, and set the price and credit terms" have been found to be supervisors of the CCE. *Possick*, 849 F.2d at 336. Here, the substantial outstanding balances revealed by the drug ledgers demonstrate that a relatively large amount of cocaine was involved. This fact, as well as the regularity with which the south side group transacted business with Celestino, are "indicative of a formal management relationship." *Id.* at 337.

Our review of the record thus establishes that a reasonable jury could have found that Celestino supervised, organized, or

managed Lawrence Jackman, Evilio Pinto, Maria Pinto, Orlando Carbonell, and the south side group. Accordingly, we affirm Celestino's conviction of operating a CCE.

### B. *Proof of Three Predicate Acts*

As noted in the previous section, under the CCE statute the government must prove "a continuing series of violations" of the federal narcotics laws. 21 U.S.C. § 848(b)(2). This language has been interpreted to mean that at least three violations must be shown. *See United States v. Chiattello*, 804 F.2d 415, 420 (7th Cir. 1986); *United States v. Markowski*, 772 F.2d 358, 361 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). Celestino argues that his CCE conviction must be vacated because two of the substantive offenses—offenses that he was convicted of and that the jury may have relied upon in determining that the series of violations requirement was satisfied—were not proper predicate violations. The first improper predicate act, according to Celestino, is count 2 of the indictment. The district court entered a judgment of acquittal on that count.[35] Celestino contends that reversal of his conviction on count 2 requires that his CCE conviction be vacated because the jury may have relied on that count as one of the three predicate acts needed to convict him of the CCE charge. In addition to count 2 being an ineligible predicate act, Celestino also asserts that counts 13 and 14 were multiplicitous[36] and, as such, could not constitute

---

**34.** *See United States v. Possick*, 849 F.2d 332, 336 (8th Cir.1988); *United States v. Jones*, 801 F.2d 304, 308 (8th Cir.1986); *United States v. Zavala*, 622 F.Supp. 319, 335 (N.D.Cal.1985), *aff'd*, 839 F.2d 523 (9th Cir.1988), *petition for cert. filed*, Mar. 30, 1988. *But see United States v. Aguilar*, 843 F.2d 155, 157 and n. 5 (3d Cir.1988), *petition for cert. filed*, June 24, 1988; *United States v. Wilkinson*, 754 F.2d 1427, 1433 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Adamo*, 742 F.2d 927, 932–33 (6th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985).

**35.** The district court granted motions for judgment of acquittal on count 2 filed by both Mr. Leon and Celestino because of a fatal variance between the date alleged in the indictment and the proof at trial.

**36.** Multiplicity is the error of charging a single crime in separate counts. *United States v. Thompson*, 624 F.2d 740, 742 (5th Cir.1980); *see* W. LaFave & J. Israel, 2 *Criminal Procedure* § 19.2 at 457–58 (1984) ("A multiplicity issue is ... presented when a series of repeated acts are charged as separate crimes but the defendant claims they are part of a continuous transaction and therefore a single crime."). This circuit has said that "[a] party waives a claim of multiplicity if he fails to raise it before trial." *United States v. Mosley*, 786 F.2d 1330, 1333 (7th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). Celestino did not present his multiplicity contention with respect to counts 13 and 14 to the district court. However, we need not decide whether he nevertheless may raise the multiplicity question in the context of arguing that the government failed to

two separate predicate acts. Again, because it is impossible to tell whether the jury improperly relied upon counts 13 and 14 for two of the requisite predicate acts when at most they constituted a single predicate act, Celestino contends that his CCE conviction must be vacated.

■ Even assuming that count 2 is an improper predicate act because the district court acquitted Celestino on that count [37] and that counts 13 and 14 are multiplicitous, we disagree with Celestino that, as a result, his conviction on the CCE charge must be vacated. Celestino's argument ignores the fact that he was convicted of *six* substantive offenses of possession with intent to distribute. Accordingly, disregarding the jury's possible consideration of count 2 and consideration of counts 13 and 14 as separate offenses, we are left with four substantive charges of which Celestino was convicted.[38] The jury's findings of guilt on each of the remaining four charges are more than sufficient to satisfy the three predicate acts requirement for conviction under the CCE statute.

Celestino argues that *United States v. Ruggiero*, 726 F.2d 913 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed. 2d 60 (1984), supports his claim that the legal insufficiency of count 2 and counts 13 and 14 requires that his CCE conviction be vacated. *Ruggiero* involved a prosecution for RICO under which the government was required to prove at least two predicate acts. The RICO count in the indictment alleged that the defendant was involved in eight different conspiracies. The court previously had held that one of the eight conspiracies relating to gambling could not

be used as a predicate act under RICO. As a result, the court determined that the defendant's conviction on the RICO count must be vacated:

> Because the jury was asked to determine only the guilt or innocence of [the defendant] on the RICO conspiracy count, we cannot tell from its verdict on Count One what decisions it made with respect to the eight predicate acts. Its verdict of guilty establishes that [the defendant] had committed at least two of the charged predicate conspiracies. For all we know, the jury may have found he committed more than two, possibly even all eight. However, absent some indication by the jury that its determination of guilt rested on two or more predicate acts that are legally sufficient, we are required to reverse the conviction because the legally insufficient predicate act relating to gambling may have been necessary to the verdict.

*Id.* at 921. *Ruggiero* is distinguishable from Celestino's case. The defendant in *Ruggiero* was not charged with, and convicted of, the separate conspiracy offenses listed under the RICO count as predicate acts. Consequently, in *Ruggiero*, the court could not determine which offenses the jury found the defendant had in fact committed.

A case more like the present one is *United States v. Pepe*, 747 F.2d 632, 667–68 (11th Cir.1984). In *Pepe*, the defendant was convicted of a RICO violation. The RICO count of the indictment alleged ten predicate acts that incorporated by reference four other counts of the indictment.

---

prove the requisite three predicate acts under the CCE charge. We hold that the evidence was sufficient for the jury to find three predicate acts even if counts 13 and 14 were multiplicitous.

**37.** The government asserts that count 2 may still constitute a predicate act because a "violation," as that term is used in the CCE statute, refers to any offense regardless of whether that offense led to a conviction. *See United States v. Markowski*, 772 F.2d 358, 361 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). The government argues that the reason why the district court vacated Celestino's conviction on count 2—a variance between the

date alleged and the date proved at trial—does not mean that Celestino did not commit the crime alleged in that count. As we note in the text, we need not decide this issue.

**38.** The government has not argued that a narcotics conspiracy can be a predicate offense of a CCE charge. This appeal thus does not present the occasion for us to decide that question, which has been explicitly left open in our prior cases. *See United States v. Chiattello*, 804 F.2d 415, 420 (7th Cir.1986); *Markowski*, 772 F.2d at 361 n. 1; *United States v. Cerro*, 775 F.2d 908, 910 (7th Cir.1985).

These four other counts charged various substantive offenses. On appeal, the court found the evidence insufficient on one of these substantive counts. The court nevertheless upheld the defendant's conviction on the RICO count because at least two other counts remained. "Counts three and six operated like special verdicts; by finding guilt on those counts the jury also found that two predicate acts listed in count two had been shown." *Id.* at 668; *see also United States v. Sterling,* 742 F.2d 521, 526–27 (9th Cir.1984) (court does not address the issue of whether a conspiracy charge can serve as a predicate offense to a CCE charge; since the jury found the defendant guilty of each of three substantive counts, the court could disregard the jury's possible consideration of the conspiracy counts), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); *United States v. Losada,* 674 F.2d 167, 174 (2d Cir.) (dismissal of one count alleged as a predicate act in the CCE charge did not require reversal of the CCE conviction because the defendant was convicted of three other substantive counts also incorporated in the CCE charge as predicate acts), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). *See generally United States v. Anderson,* 809 F.2d 1281, 1283–85

(7th Cir.1987). We agree with the essential reasoning of these cases and therefore reject Celestino's argument that the government failed to prove the requisite number of predicate acts under the CCE statute.[39]

### C. *Sufficiency of the CCE Charge in Indictment*

■ Celestino argues that count 21 of the indictment was insufficient as a matter of law because it failed to inform him of the specific basis for the CCE charge. His argument is twofold: first, count 21 does not set forth any factual allegations such as the predicate offenses or overt acts in support of the charge; and second, it also fails to incorporate by reference any other counts in the indictment as predicate offenses.[40] Celestino contends that the government's tactic of withholding this information deprived him of the opportunity to defend against the CCE charge.[41]

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct.

**39.** It has been suggested that, with respect to the RICO statute, there is a conflict among the circuits on the question of whether a RICO conviction may stand when some of the defendant's convictions for the predicate offenses are overturned but two or more are not. *See McCulloch v. United States,* —— U.S. ——, 108 S.Ct. 337, 98 L.Ed.2d 364 (1987) (White, J., dissenting from denial of certiorari). *But see United States v. Holzer,* 840 F.2d 1343, 1350–51 (7th Cir.1988) (suggesting that such a conflict does not exist). Whatever the merits of this argument with respect to RICO convictions, no court has suggested that the argument can be transferred to the CCE statute under which it is sufficient to find that the defendant committed three drug offenses as part of a continuing series of drug violations. In this case, no rational jury could conclude that the four drug convictions not in dispute were part of such a continuing series.

**40.** Count 21 provided that:

Beginning on or about March 1, 1985 and continuing up to and including the date of this indictment, in the Eastern District of Wisconsin and elsewhere CELESTINO ORLANDO ESTEVEZ

defendant herein, did knowingly and willfully engage in a continuing criminal enterprise, that is, that the defendant CELESTINO ORLANDO ESTEVEZ did violate Title 21, United States Code, Sections 841(a)(1) and 843(b), said violations which were a part of a continuing series of violations of these statutes, undertaken by the defendant in concert with at least five other persons with respect to whom the defendant occupied a position of organizer, supervisor, and manager, and from which continuing series of violations the defendant obtained substantial income and resources;

All in violation of Title 21, United States Code, Section 848.
Celestino R.35 (Second Superseding Indictment).

**41.** The government asserts that Celestino has waived this argument by failing to raise the matter in the district court. The record does not support the government's assertion. Prior to trial, counsel for Celestino moved the district court to dismiss the indictment for vagueness and for failure to state a claim. Celestino R.46H, Celestino R.46J.

2887, 2907, 41 L.Ed.2d 590 (1974); *see also United States v. Mosley*, 786 F.2d 1330, 1334 (7th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985); *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.1981). In this case, Celestino attacks count 21 of the indictment on the ground that it failed to fairly inform him of the charge against which he had to defend because it did not specifically enumerate or incorporate by reference the predicate offenses the government intended to rely on in proving the charge.

 We do not approve of the government's method of charging in this case. However, here we do not think it amounts to reversible error. Several courts have held that the government need not list the predicate acts in the indictment. *See United States v. Zavala*, 839 F.2d 523, 527 (9th Cir.1988) (district court did not err in denying a bill of particulars naming the predicate felonies for the continuing enterprise charge), *petition for cert. filed*, Mar. 30, 1988; *United States v. Becton*, 751 F.2d 250, 256 (8th Cir.1984) (the failure of the CCE count to list the specific violations of federal narcotics law constituting the alleged continuing criminal enterprise is not fatal to the indictment), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *United States v. Sterling*, 742 F.2d 521, 526 (9th Cir.1984) ("there is no legal requirement that the violations which make up the continuing series be specifically listed in the indictment"), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); *Sperling v. United States*, 692 F.2d 223, 226 (2d Cir.1982) ("The law requires merely that there be evidence that the defendant committed three substantive offenses—even if not charged in separate indictments—to provide the predicate for a § 848 conviction."), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

In *Becton*, the Eighth Circuit relied on the fact that the other counts of the indictment gave the defendant notice of the underlying felonies: "Counts II and V specifically charged two narcotics law violations and the 'overt acts' section of Count II listed allegations comprising additional violations." 751 F.2d at 256. In this case as well, Celestino was charged in six other counts with various narcotics violations under 21 U.S.C. § 841. These counts gave him actual notice of the predicate acts on which the government would rely at trial for conviction under the CCE count. *See United States v. Rodriguez–Ramirez*, 777 F.2d 454, 459 (9th Cir.1985) ("the indictment as written provided sufficient notice to defendants of the nature of the charges, and so served the essential functions of a criminal indictment"). In addition, Celestino does not contend that he was in fact unable to defend against the charges because of the government's lack of specificity in charging him. *See Becton*, 751 F.2d at 256 (if the defendant has actual notice of the charges, due process may be satisfied despite an inadequate indictment). He therefore was not prejudiced by any possible defect in count 21.[42]

D. *Conviction of Lesser Included Offense*

 As we noted earlier, Celestino was convicted of conspiracy (count 1) as well as conducting a CCE (count 21). A conspiracy charge is a lesser included offense of a CCE charge. *See United States v. Peters,*

---

**42.** Celestino also argues that the government's reference in count 21 to alleged violations of 21 U.S.C. § 843(b), *see supra* note 40, constitutes clear error that requires reversal of his conviction. Section 843(b) makes it a crime to use a communication facility in committing, causing, or facilitating a conspiracy. Although count 21 referred to violations of § 843(b), no other count in the indictment charged Celestino with a substantive offense under that provision. However, the jury was instructed that it could consider uncharged offenses as predicate acts. Celestino did not object to the instruction and, therefore, our review is limited to plain error. *See infra* Part V–B. Because the jury convicted Celestino of six other *charged* substantive offenses, at least four of which were valid predicate acts, the error, if there was one, did not have a probable impact on the jury's determination that Celestino was guilty of conducting a CCE.

791 F.2d 1270, 1288 n. 22 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986); *United States v. Jefferson*, 714 F.2d 689, 703–06 (7th Cir. 1983);[43] *see also United States v. Possick*, 849 F.2d 332, 341 (8th Cir.1988); *United States v. Young*, 745 F.2d 733, 750 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *cf. Garrett v. United States*, 471 U.S. 773, 794, 105 S.Ct. 2407, 2419, 85 L.Ed.2d 764 (1985); *Jeffers v. United States*, 432 U.S. 137, 150, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977). A defendant cannot be punished for both crimes. *See Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977) (the fifth amendment forbids cumulative punishment for a greater and lesser included offense); *see also Jefferson*, 714 F.2d at 703 ("To convict and impose punishment for both [the conspiracy and the CCE counts] would be tantamount to twice convicting and punishing one defendant for a single offense, in violation of the Double Jeopardy Clause."). The government argues that Celestino did not suffer cumulative punishment for both crimes because the district court suspended his sentence on the lesser included conspiracy charge. While acknowledging that the usual way to deal with situations like this is to vacate the conspiracy conviction, the government asserts that the district court's handling of the situation did not prejudice Celestino because he has not suffered any adverse consequences from the suspended sentence on count 1. The government therefore urges us to permit Celestino's conviction on the conspiracy count to stand.

Until recently, this circuit followed the majority of the circuits and vacated *both* the sentence and the conviction. We ad-dressed this very question in *Jefferson* and said that the sentence *and* the conviction must be vacated. 714 F.2d at 703 n. 28. Most of the other circuits have used the same approach. *See Possick*, 849 F.2d at 341; *United States v. Stallings*, 810 F.2d 973, 975–76 (10th Cir.1987); *United States v. Maull*, 806 F.2d 1340, 1346–47 (8th Cir. 1986), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987); *United States v. Schuster*, 769 F.2d 337, 343–45 (6th Cir. 1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986); *United States v. Bascaro*, 742 F.2d 1335, 1357–58 (11th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985); *United States v. Brantley*, 733 F.2d 1429, 1436 n. 15 (11th Cir.1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); *United States v. Smith*, 703 F.2d 627, 628 (D.C.Cir.1983) (per curiam); *cf. Ball v. United States*, 470 U.S. 856, 864, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985) (where Congress did not intend to punish violations of two statutes separately, "[o]ne of the convictions, *as well as its concurrent sentence*, is unauthorized punishment for a separate offense" (emphasis supplied)). *But see United States v. Benevento*, 836 F.2d 60, 73 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988);[44] *United States v. Grayson*, 795 F.2d 278, 287 (3d Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987) (vacating consecutive sentences but not convictions); *United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir.1985) (same); *United States v. Aiello*, 771 F.2d 621, 632–34 (2d Cir.1985).

**43.** Our observation in *United States v. Jefferson*, 782 F.2d 697, 701 n. 3 (7th Cir.1986), that the earlier case cited in the text was incorrectly decided only applies to the holding that predicate drug offenses are lesser included offenses of the CCE statute. That holding was overruled by the Supreme Court in *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

**44.** The Second Circuit takes the view that the proper course of action is to "combine" the "convictions on the lesser offenses ... with the conviction on the greater offense," so that the convictions for the lesser offenses would cease to exist unless the conviction for the greater offense should be reversed, in which event the defendant could be punished for the lesser offenses.
*United States v. Aiello*, 771 F.2d 621, 632 (2d Cir.1985) (quoting *United States v. Osorio Estrada*, 751 F.2d 128, 135 (2d Cir.1984), *modified on other grounds*, 757 F.2d 27 (2d Cir.), *cert. denied*, 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985)).

In *United States v. Bond,* 847 F.2d 1233 (7th Cir.1988), another panel of this court decided that "a court may impose concurrent sentences for a § 846 conspiracy and the CCE offense." 847 F.2d at 1239. While the panel did not cite the previous holding in *Jefferson* and did not circulate the opinion to the entire court, the effect of the holding in *Bond* was to overrule the court's previous holding in *Jefferson* and to adopt a minority position.

We cannot ignore the existence of *Bond.* Under the doctrine of *stare decisis,* we are constrained to apply its holding here. Therefore, we must conclude that, under the prevailing precedent in this circuit, we cannot afford Celestino relief in this regard.[45]

### E. *Severance*

Celestino argues that the district court erred in denying his motion for severance under Federal Rule of Criminal Procedure 14. He contends that he was entitled to a severance because the disparity between the evidence against him and the evidence against his codefendant and son Orlando, made it impossible for the jury to consider independently the evidence against him. Celestino asserts that his familial relationship with Orlando made it even easier for the jury to impute to him all of the evidence implicating Orlando.

Rule 14 permits the trial court, in the exercise of its discretion, to grant separate trials when the interests of justice so require.[46] A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. *United States v. Garner,* 837 F.2d 1404, 1413 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *United States v. Rivera,* 825 F.2d 152, 159 (7th Cir.), *cert. denied,* —

U.S. —, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987); *United States v. Bruun,* 809 F.2d 397, 407 (7th Cir.1987); *United States v. Gironda,* 758 F.2d 1201, 1220 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion. *See United States v. Holland,* 831 F.2d 717, 722 (7th Cir.1987); *United States v. Shively,* 715 F.2d 260, 267 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). In order to appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial. *United States v. Peters,* 791 F.2d 1270, 1301 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986); *United States v. Oglesby,* 764 F.2d 1273, 1276 (7th Cir.1985). Actual prejudice means that the defendant could not have a fair trial without severance, " 'not merely that a separate trial would offer him a better chance of acquittal.' " *Peters,* 791 F.2d at 1301 (quoting *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977)); *see also United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985).

We think that Celestino has failed to meet his burden under this most difficult standard. It is clear that Celestino's contention that he was entitled to a severance is based on his belief that the evidence was insufficient to convict him of the CCE charge. He asserts that because there was no evidence to establish that he held a supervisory role in the CCE, his conviction on that count "must have resulted from the spill-over of evidence presented

---

**45.** In this case, the district court did not impose a concurrent sentence for the conspiracy count. Rather, it imposed a suspended sentence. However, the court was aware that he could not impose separate punishment for the CCE charge and the conspiracy charge. *See United States v. Estevez,* No. 86–CR–79, order at 5 (E.D.Wis. 1987); R.91 at 5.

**46.** Rule 14 provides, *inter alia,* that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
> Fed.R.Crim.P. 14.

against his son Orlando." Celestino's Br. at 44 n. 18. We already have held, however, that the evidence was sufficient to convict Celestino of managing a CCE. Accordingly, Celestino's argument that he was prejudiced by the joinder is without merit. *See United States v. Possick*, 849 F.2d 332, 338–39 (8th Cir.1988). Again, the question under Rule 14 is not whether a separate trial would have offered better chances of acquittal but rather whether the defendant received a fair trial. We cannot say that Celestino's trial was unfair. *See United States v. Zanin*, 831 F.2d 740, 744 (7th Cir.1987) (rejecting defendant's claim that she was entitled to a severance because the jury imputed guilt by association with her husband, against whom the evidence was stronger); *Peters*, 791 F.2d at 1302 (rejecting defendant's argument that "his fraternal relationship with [a codefendant] made it impossible for the jury to follow the court's instructions, and that his conviction thus resulted from 'suspicion and innuendo' created by the evidence against [his brother]").

## IV

### Appeal of Amado Raphael Leon, No. 87–1310

Amado Leon was convicted of one count of conspiracy to distribute cocaine (count 1) and three counts of possession of cocaine with intent to distribute (counts 2, 13, and 14). He was sentenced to twenty years on count 1, and to ten years each on counts 13 and 14 to be served concurrent with each other and concurrent with the sentence imposed on count 1. On appeal, Mr. Leon argues that the district court erred in refusing to grant his motion for judgment of acquittal on count 14.

### A. *Background*

Mr. Leon filed a postconviction motion for judgment of acquittal on all counts in which he argued that the evidence was insufficient to support his convictions. The

47. *See supra* note 35.

48. In *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court held that each person involved in a con-

district court granted Mr. Leon's motion as to count 2,[47] but denied it as to the other counts. The court held that the evidence was more than adequate to convict Mr. Leon of the conspiracy charge (count 1) and to support Mr. Leon's conviction of possession with intent to distribute the 17 kilograms of cocaine found at the Oak Creek house (count 3). However, the court did not specifically address the evidence as it related to count 14.

Count 14 charged Mr. Leon with possession with intent to distribute approximately 750 grams of cocaine. Officials seized the 750 grams of cocaine during their search of the 63rd Street residence. At approximately the same time, other officials were arresting Mr. Leon at the Oak Creek residence. Mr. Leon argues that he cannot be convicted of possession when he did not have actual possession of the 750 grams of cocaine and when there was little or no evidence to establish that he had access to or control over the drugs. The government argues that the evidence established that Mr. Leon (1) had distributed cocaine regularly from the 63rd Street residence; (2) had collected money which was stored at that house; and (3) had access to the safe containing the 750 grams of cocaine and often took cocaine from it. Thus, the government asserts, the evidence was more than sufficient to establish that Mr. Leon constructively possessed the cocaine in the 63rd Street residence, or in the alternative, that he aided and abetted the possession with intent to distribute the 63rd Street cocaine.

### B. *Analysis*

■ At trial, the government argued that Mr. Leon was guilty of count 14 on theories of constructive possession, aiding and abetting, and vicarious coconspirator liability under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[48] The jury was instructed on all

tinuing conspiracy can be held liable for the crimes of his coconspirators if committed in furtherance of the conspiracy. *See generally United States v. Collazo*, 815 F.2d 1138 (7th

three theories. The government has not, however, raised the question of vicarious coconspirator liability in this appeal; apparently it has abandoned the theory despite there having been an instruction to the jury on this point. We shall hold the government to its waiver and consider only whether Mr. Leon's conviction on count 14 can stand under theories of constructive possession or aiding and abetting.

The rule of constructive possession holds that "a person can be convicted for possessing cocaine though he does not possess it in a literal sense." *United States v. Manzella,* 791 F.2d 1263, 1266 (7th Cir. 1986). "To establish constructive possession of a controlled substance, the government must produce evidence demonstrating 'ownership, dominion, or control over the contraband....'" *United States v. Galiffa,* 734 F.2d 306, 316 (7th Cir.1984) (quoting *United States v. Ferg,* 504 F.2d 914, 916–17 (5th Cir.1974)); *see also United States v. Rodriguez,* 831 F.2d 162, 167 (7th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988); *United States v. Perlaza,* 818 F.2d 1354, 1360 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987); *Manzella,* 791 F.2d at 1266; *United States v. Shackleford,* 738 F.2d 776, 785 (7th Cir.1984); *United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). "Mere association with those who possess the drugs is not good enough." *Manzella,* 791 F.2d at 1266. However, "[r]esidence in a house used as a drug distribution center, and evidence of direct access to and participation in the [drug] distribution on the day of [the defendant's] arrest," *is* sufficient. *Galiffa,* 734 F.2d at 316.

■■■ Under the criminal attempt statute, 18 U.S.C. § 2, a person who aids and abets the commission of a crime can be punished as a principal. Because aiding and abetting is not a separate offense, it need not be charged separately in the in-

dictment. *Galiffa,* 734 F.2d at 312. A person is guilty of aiding and abetting a crime if he "encouraged or assisted another in committing the offense, and ... had the intent to aid in its commission." *Rodriguez,* 831 F.2d at 167; *see also United States v. Gabriel,* 810 F.2d 627, 636 (7th Cir.1987); *United States v. Collins,* 779 F.2d 1520, 1528 (11th Cir.1986); *United States v. Pope,* 739 F.2d 289, 291 (7th Cir. 1984). "Thus, the prosecution must prove (1) association, i.e., that the defendant shared the criminal intent of the principal; and (2) participation, i.e., some overt act designed to aid in the venture's success." *Pope,* 739 F.2d at 291.

■■■ Viewed in the light most favorable to the government as we are required to do, *see supra* Part III–A, the evidence was sufficient to support Mr. Leon's conviction of possession of the 63rd Street cocaine under either a theory of constructive possession or aiding and abetting. With regard to constructive possession, the evidence showed more than mere association with those who possessed the drugs. Lawrence Jackman testified that Mr. Leon knew the combination to the safe in the 63rd Street house and that he regularly took cocaine from it. A reasonable jury could conclude from his testimony that Mr. Leon had access to and ability to exercise control over the 63rd Street cocaine. With regard to aiding and abetting, the evidence is even more clear. The testimony of both Mr. Jackman and Mr. Pinto directly tied Mr. Leon to the conspiracy. Mr. Jackman described Mr. Leon's role as being primarily that of a "bodyguard," protecting the Estevez family and also the cocaine itself. This testimony was reinforced by the fact that the search of the Oak Creek residence turned up three guns. In addition, Mr. Jackman testified that Mr. Leon helped to load and unload cocaine. Mr. Pinto testified that Mr. Leon often was present during drug deals and even participated in

Cir.1987); *United States v. Manzella,* 791 F.2d 1263, 1267–69 (7th Cir.1986); *United States v. Galiffa,* 734 F.2d 306, 313–14 (7th Cir.1984). The jury must be instructed on the requirements of vicarious liability under *Pinkerton* for a ver-

dict to stand on that ground. *See United States v. Rodriguez,* 831 F.2d 162, 168 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988); *Manzella,* 791 F.2d at 1267.

them. A handwriting expert identified Leon's handwriting in the drug records found at the 63rd Street house. A reasonable jury could conclude from this evidence that Mr. Leon aided and abetted the possession with intent to distribute of his coconspirators with respect to the 750 grams of cocaine found at the 63rd Street residence.

## V

### Appeal of Adalberto Herrera, No. 87–1390

Adalberto Herrera was convicted of one count of conspiracy to distribute cocaine (count 1) and one count of possession of cocaine with intent to distribute (count 13). The district court sentenced him to five-year terms in prison for each offense. The sentences are to run concurrently. On appeal, Mr. Herrera argues (1) that the evidence was insufficient on both counts; (2) that the district court's failure to give a jury instruction on the government's use of an alias constituted plain error; (3) that he was denied effective assistance of counsel; and (4) that the district court erred in refusing to grant him a severance. We address each of these claims *seriatim.*

### A. *Sufficiency of the Evidence*

#### 1. Background

Our standard of review is limited by what a reasonable jury could infer from the evidence viewed in the light most favorable to the government. *See supra* Part III–A. The evidence at trial revealed the following. On the morning of June 30, 1986, Officer Robert Hillman, a Deputy Sheriff of the Milwaukee County Sheriff's Department, and four other Deputy Sheriffs assisted the DEA and the FBI in executing a search warrant at the Oak Creek residence. The officers arrived at the residence in full uniform at approximately 7:40 a.m. They knocked on the front door and announced: "police, search warrant." After repeating the announcement and receiving no reply, one of the officers made a forced entry using a sledgehammer to knock in the door. Upon entry, the officers discovered a broken wooden chair which had been placed up against the doorknob. Officer Hillman testified that they waited approximately 30 seconds before breaking down the door and that it took another 15 seconds before that task was accomplished.

Once inside the house, Officer Hillman and one other officer proceeded up the stairs. They again yelled out: "police, search warrant." As Officer Hillman reached the upstairs hallway, he saw Mr. Herrera come out of one of the bedrooms carrying a gun. He again yelled "police, search warrant," and ordered Mr. Herrera to drop his weapon. Mr. Herrera raised the gun to waist level. Officer Hillman raised his weapon and again ordered Mr. Herrera to drop his gun. Officer Hillman held his gun pointed at Mr. Herrera for approximately 5 seconds before Mr. Herrera lowered his own weapon. During these five seconds, Officer Hillman attempted to fire his gun at Mr. Herrera but the gun would not fire because the safety mechanism was not released. After lowering his gun, Mr. Herrera retreated to the bedroom located in the southeast corner of the house. Officer Hillman followed Mr. Herrera into the bedroom where he found Mr. Herrera lying on the bed. He then placed Mr. Herrera under arrest. Meanwhile, the other officer had arrested Amado Leon, who had retreated to another bedroom located in the northeast corner of the house. Officer Hillman testified that Mr. Herrera appeared to speak only Spanish and that Mr. Leon translated for him.

DEA Agent Robert Hartman also participated in the execution of the search warrant at the Oak Creek residence. He testified as to the items found in the search. A large gray safe was found in the closet of the master bedroom which could not be opened at that time because neither Mr. Herrera nor Mr. Leon appeared to know the combination. Later, at Agent Hartman's office, the safe was opened and 17 kilograms of cocaine and approximately $18,000 in United States currency were found inside. In addition to the safe, the search uncovered several guns with ammunition, items typically used in the packaging of cocaine such as silver duct tape and plastic bags, several notebooks, and a

scale. The agents also found numerous documents, receipts, and personal money orders bearing the names of various conspirators. None of these miscellaneous documents bore the name Adalberto Herrera and most of these items were recovered from the master bedroom located in the southwest corner of the house. The searching officers found no evidence that Mr. Herrera had ever used the southwest bedroom. The officers did find Mr. Herrera's wallet in the southeast bedroom. Inside the wallet they found a Florida driver's license in the name of Adalberto Herrera listing an address in Miami. They also found a business card which listed the Miami address and phone number of Orlando Estevez.

After searching the house, the officers went to the garage where they found a brown 1986 Ford LTD. The vehicle was locked, and the officers were unable to find the keys to open it. Nonetheless, Agent Hartman was able to break into the car. A search of the interior did not turn up anything. Later, the keys to the brown LTD were discovered in the possession of Celestino Estevez, who was arrested at the 63rd Street house on the same morning. Agent Hartman later obtained a second search warrant for the car and uncovered another 12 kilograms of cocaine hidden in the spare tire and door panels.

Mr. Herrera asserts that the government's case is built on inferences piled upon inferences, none of which are supported by the record. He contends that the case against him consists solely of his presence at the Oak Creek residence on the morning of June 30, 1986 and his association with his codefendants, primarily Orlando Estevez. Significantly absent, he asserts, is any evidence that he knew about the drug conspiracy or intended to join in it.

2. Analysis

a. *conspiracy count*

"A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act."

*United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). A formal agreement need not be demonstrated although agreement is the primary element of a conspiracy. *Id.* Applying this definition to the evidence of conspiracy adduced at trial, it is clear that the government presented sufficient evidence from which the jury could have found that a conspiracy existed. Mr. Herrera does not argue to the contrary but rather insists that the evidence was insufficient to show that he was a participant in the conspiracy. We disagree.

In order to establish an alleged coconspirator's participation in the conspiracy, the government must prove that the alleged coconspirator knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose. *United States v. Beniach*, 825 F.2d 1207, 1211 (7th Cir.1987); *United States v. Abayomi*, 820 F.2d 902, 905 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987); *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir. 1985); *United States v. Percival*, 756 F.2d 600, 611 (7th Cir.1985); *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984). Even a slight connection between the defendant and the conspiracy may support a conviction. *United States v. Alvarez*, 833 F.2d 724, 730 (7th Cir.1987); *Abayomi*, 820 F.2d at 906; *United States v. Perlaza*, 818 F.2d 1354, 1359 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987); *United States v. Castillo*, 814 F.2d 351, 353 (7th Cir.1987); *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). "A single act may be foundation for drawing the actor within the ambit of a conspiracy.... But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may *reasonably infer* from it such an intent." *United States v. Quintana*, 508 F.2d 867, 881 (7th Cir.1975) (quoting *United States v. Varelli*, 407 F.2d 735, 743 (7th Cir.1969)) (emphasis supplied). As the *Quintana*

court suggested, the government may rely on inferences to prove the requisite intent to participate. Direct evidence of intent is rarely available. Thus, circumstantial evidence "as a practical matter ... is often all that exists." *United States v. Page*, 580 F.2d 916, 920 (7th Cir.1978). In reviewing the sufficiency of the evidence in cases based largely on circumstantial evidence, we have said:

> [W]hile it is important that we not permit a verdict based solely on the piling of inference upon inference, it is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference...." These observations are especially relevant to proof of conspiracy, the principal crime charged here. Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence.

*United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (citations omitted) (quoting *United States v. Kwitek*, 467 F.2d 1222, 1226 (7th Cir.1972), *cert. denied*, 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984); *see also United States v. Guzzino*, 810 F.2d 687, 696–97 (7th Cir.), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1957, 95 L.Ed.2d 529 (1987); *Perry*, 747 F.2d at 1169; *United States v. Roman*, 728 F.2d 846, 858 (7th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

We first address Mr. Herrera's contention that the jury improperly convicted him merely because he was at the Oak Creek house on the morning of his arrest. In this regard, we note that it is well established in this circuit that mere association with, knowledge of, approval of, or presence at a conspiracy is insufficient to support a conviction for conspiracy. *See United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir. 1987), *cert. denied*, — U.S. —, 108 S.Ct.

1738, 100 L.Ed.2d 202 (1988); *Abayomi*, 820 F.2d at 906; *Perry*, 747 F.2d at 1169; *Xheka*, 704 F.2d at 988–89; *Quintana*, 508 F.2d at 880; *United States v. Baker*, 499 F.2d 845, 848 (7th Cir.), *cert. denied*, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974). As the Fifth Circuit has said, the government must show more than that the defendant was arrested in " 'a climate of activity that reeks of something foul.' " *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir.1985) (quoting a series of cases cited at 776 F.2d at 549 n. 9) (footnote omitted). We reaffirm this principle today. However, "presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy." *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). Presence may " 'make participation ... "more likely than not." ' " *Alvarez*, 833 F.2d at 730 (quoting *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979)). This is such a case.

■ Viewed in the light most favorable to the government, the evidence showed that: (1) Mr. Herrera was arrested at the Oak Creek house where police found 17 kilograms of cocaine locked in a safe, as well as 12 kilograms of cocaine hidden in a car parked in the garage of that house; (2) the police had to break open the front door because of a chair propped up against the doorknob on the inside; (3) after the police entered the house, Mr. Herrera confronted them with a .357 revolver loaded with hollow point bullets; (4) despite being ordered to drop his weapon, Mr. Herrera raised a loaded and cocked revolver and pointed it at a uniformed police officer who responded by attempting to fire at him; (5) Mr. Herrera was carrying a Florida driver's license and spoke no English; and (6) Mr. Herrera had a card in his wallet that listed the Miami address and telephone number of Orlando Estevez. The jury reasonably could have inferred from these circumstances of his arrest that Mr. Herrera "was not an uninterested bystander, silently

cheering the conspirators on." *Xheka*, 704 F.2d at 989. Mr. Herrera came out of a bedroom brandishing a gun which he pointed at an officer in uniform for long enough that the officer felt it necessary to fire his own gun in self-defense. The jury reasonably could have decided that, by his actions, Mr. Herrera meant to contribute to the success of the conspiracy. Based on this view of the evidence, the government has shown more than "mere presence."

Mr. Herrera asserts that our prior decisions in *Baker*, 499 F.2d 845, and *Quintana*, 508 F.2d 867, control the disposition of his case. The courts in both cases reversed the defendants' convictions because the evidence in support thereof consisted solely of presence and association. In *Baker*, the defendant was present at the lodgings he shared with a conspirator while drug business was discussed. In addition, he drove his roommate to the scene of the distribution accompanied by another person who was not a part of the conspiracy. In *Quintana*, the defendant was a conspirator's godson. His connection to the conspiracy consisted of his presence in the latter's store while conspiracy business was being discussed. There was no evidence, however, that he even heard the conversations, let alone did anything to advance the conspiracy's ends. Both these cases are distin-

guishable in that the jury in each had no reason to be suspicious of the defendants' presence and the government did not offer any affirmative evidence that the defendants intended to aid the conspiracy.

In contrast, the evidence in this case showed that the Oak Creek house was used as a drug distribution center. The jury properly could have concluded that Mr. Herrera's presence there signaled involvement in the conspiracy. *See Perry*, 747 F.2d at 1170 ("Certainly, there appears to be no other plausible explanation for Mr. Perry's presence...."); *Mancillas*, 580 F.2d at 1308 ("The jury could properly have concluded there was no reason for Lowry's presence in the car or the motel room unless he was a part of the deal."). In addition, as we already have noted, the jury reasonably could have relied on Mr. Herrera's actions in pointing a gun at a uniformed police officer as affirmative evidence that he intended to advance the ends of the conspiracy. The jury was instructed that mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish guilt. We assume that the jury correctly applied the law as instructed. The jury *could have* concluded that Mr. Herrera's presence at the Oak Creek house did not establish his guilt beyond a reasonable doubt.[49] How-

---

**49.** In his brief, Mr. Herrera points to exculpatory testimony in the record which he claims supports his view of the evidence. He relies principally on Officer Hartman's testimony that documents seized from the Oak Creek house were found in the master bedroom rather than his bedroom and did not have his name on them; that his handwriting was not found in any of the drug ledgers that were seized; that his fingerprints were not found on the safe or on the drug packets found therein; and that he had never been observed by agents in the several months of surveillance that preceded his arrest on June 30, 1986.

Moreover, Mr. Herrera offers an innocent explanation for why he pointed the gun at Agent Hillman. He claims that the evidence showed only that, in the early hours of June 30, 1986, he "was abruptly awakened from sleep by the police's use of a sledge hammer [sic] to break down the front door." Herrera's Br. at 25. Because he could not understand the language that was being spoken by the police officers, and was startled by the commotion that they created, "[he] went into the upstairs hall of the residence, with a pistol in hand, to confront the

then-unknown intruders. [He] briefly raised the weapon for at most five seconds and then, realizing that it was the police, dropped the weapon to his side." *Id.*

The fact that the jury also heard evidence that exculpated Mr. Herrera does not dictate a reversal of his conviction. We already have noted that, in considering the sufficiency of the evidence, an appellate court does not weigh the conflicting evidence or assess the credibility of witnesses. We must examine *all* of the evidence and consider only whether the verdict reached by the jury was a rational one in light of the government's burden of proof. Moreover, even if the picture painted by Mr. Herrera of the events of June 30, 1986 were plausible, it is no more than one view of the evidence. "When presented with the conflicting hypotheses pursued by the government and [the defendant], ... we are obligated to credit the prosecutor's inferences." *United States v. Beniach*, 825 F.2d 1207, 1212 (7th Cir.1987). "The trier of fact is free to choose among various reasonable constructions of the evidence." *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986). We

ever, the evidence also was sufficient for the jury to decide that Mr. Herrera's presence at the Oak Creek house, combined with his affirmative actions on the day of his arrest, demonstrated beyond a reasonable doubt his intent to join the conspiracy. We therefore decline to disturb the jury's verdict finding Mr. Herrera guilty of conspiracy.

### b. *possession count*

Mr. Herrera also argues that the evidence was insufficient to support his conviction for possessing the 29 kilograms of cocaine found at the Oak Creek residence. Specifically, he asserts that the government failed to prove that he constructively possessed the cocaine in the gray safe and in the brown LTD because there was no evidence from which the jury could have found that he was able to exercise control over it. However, we need not address Mr. Herrera's argument with respect to constructive possession because the evidence was sufficient to support his conviction on the ground that he knowingly aided and abetted the possession of the 29 kilograms of cocaine.

■ As we noted earlier in considering Amado Leon's challenge to the sufficiency of the evidence, *see supra* Part IV, the district court instructed the jury on liability under the aiding and abetting statute. In addition, the government argued to the jury that Mr. Herrera's conduct fell within that definition. In discussing Mr. Leon's appeal, we also set forth the standard of proof required to convict a defendant of aiding and abetting the possession of cocaine; we said that a person is guilty of aiding and abetting a crime if he encouraged or assisted another in committing the offense *and* intended to aid in the commission of the crime. We already have held that the evidence was sufficient for the jury to conclude that Mr. Herrera was at the Oak Creek residence guarding the cocaine. Accordingly, regardless of whether he had actual possession of, or was able to exercise control over, the drugs found in the safe and the brown LTD, his actions

furthered the actual or constructive possession of the drugs by others. As such, he can be held liable for possession as an aider and abettor.

### B. *Jury Instruction on Improper Alias*

#### 1. Background

Mr. Herrera next argues that his conviction should be reversed and a new trial granted because of the district court's failure to give a cautionary jury instruction on the government's improper use of an alias. At the beginning of trial, the district court presented a copy of the indictment to the jury that listed Mr. Herrera's name as "Adalberto Herrera, a/k/a Arroldo Herrera." The court explained to the jury that the term "a/k/a" meant "also known as," and that it was used to refer to various aliases that an individual might use. Before the indictment was given to the jury, Mr. Herrera's trial counsel objected to the inclusion of the name "Arroldo Herrera" on the ground that there was no evidence that Mr. Herrera ever had used that alias. The district court denied counsel's motion to strike the alleged alias and held that it was premature to rule on the issue. The court accepted the government's argument that it should wait to rule on the issue until after it had heard the evidence. If, at that point, the court determined that the government had failed to produce evidence linking Mr. Herrera to the alias, then the alias could be stricken from the indictment.

During the trial, the government introduced numerous exhibits bearing the names "Aroldo Herrera," "Arnoldo Herrera," and "Arroldo Herrera." These exhibits included documents such as utility bills for the 63rd Street house, telephone bills for the same house, Federal Express bills and receipts for items sent to and from the house, and various money order receipts. The government did not, however, offer any evidence that the defendant Adalberto Herrera had any connection with the names listed on those exhibits. In fact, Lawrence Jackman testified that there was no connection between those exhibits and the de-

---

hold that the prosecution's construction of the evidence against Mr. Herrera is reasonable.

fendant. Rather, Mr. Jackman said that it was *he* who had used several different names that sounded similar to the defendant Adalberto Herrera's name. According to Mr. Jackman, he was told to use those aliases by Celestino and Orlando Estevez. Furthermore, Mr. Jackman testified that he had never seen the defendant Adalberto Herrera before trial.

In light of the government's failure to introduce any evidence linking Mr. Herrera to the various aliases, Mr. Herrera's trial counsel renewed his motion to strike the reference to "a/k/a Arroldo Herrera" from the indictment. He also requested that a cautionary jury instruction be given to the effect that the documentary evidence bearing similar sounding names be disregarded when considering the guilt or innocence of Mr. Herrera. The district court agreed but then forgot to give the instruction.[50] Mr. Herrera's trial counsel also apparently forgot about the instruction because he failed to object when it was not given.

Mr. Herrera asserts that he is entitled to a new trial because he was greatly prejudiced by the district court's failure to give the instruction. He points to the large number of documents that came into evidence bearing the alias or a similar sounding name and contends that, because there was almost no evidence connecting him to the Estevez drug conspiracy, there was a substantial risk that the jury based its verdict of guilt on the improper evidence. He also notes an incident that occurred at trial, in which a juror was questioned by the district court on an unrelated issue and referred to him in response to the court's questioning as "Arroldo Herrera." This incident, he asserts, demonstrates that the jury was confused by the government's use of the alias.[51]

2. Analysis

 We agree that the proposed instruction was proper and should have been given. When proof of an alias is relevant to identifying the defendant, or otherwise relates to the proof of the acts charged in the indictment, it is permissible for the prosecution to include it in the indictment. *See United States v. Williams*, 739 F.2d 297, 299 (7th Cir.1984); *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir.1976); *United States v. Wilkerson*, 456 F.2d 57, 59 (6th Cir.), *cert. denied*, 408 U.S. 926, 92 S.Ct. 2506, 33 L.Ed.2d 337 (1972). In this case, the government intended to use the alias for identification purposes. Apparently, the government hoped to connect Mr. Herrera to the conspiracy, at least in part, through the documentary evidence bearing the names "Arroldo Herrera," "Aroldo Herrera," and "Arnolod Herrera." Based on the government's representations to this effect, the district court denied Mr. Herrera's pretrial motion to remove the alias from the indictment. However, it became apparent after Mr. Jackman's testimony at trial that the government was unable to prove a link between Mr. Herrera and the alias. At this point, Mr. Herrera was entitled to have the alias stricken and an appropriate instruction given to the jury. *See Clark*, 541 F.2d at 1018.

 However, Mr. Herrera's trial counsel neglected to point out that the final set of instructions omitted the requested cautionary instruction and thereby allow the district court to correct the error. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge *or omission therefrom* unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."); *see also United States v. Markowski*, 772 F.2d 358, 363 (7th Cir. 1985) (the mere offer of an instruction does not satisfy Rule 30 or preserve a claim for

---

**50.** However, the court did redact the alias from the final indictment that was given to the jury before closing arguments.

**51.** The record reveals the following dialogue:
 THE COURT: Would you state your name?
 MS. MATEL: Rose Matel, M–A–T–E–L.

 THE COURT: You raised your hand when I asked that question?
 MS. MATEL: Right.
 THE COURT: Could you tell us what, if anything, you saw?
 MS. MATEL: Well, I saw Arroldo Herrera. Tr. of Nov. 25, 1986 at 779–80.

appeal), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). Our review therefore is limited to whether there was plain error. *See* Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *see also United States v. Gruttadauro,* 818 F.2d 1323, 1326 (7th Cir.1987); *United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987); *United States v. McGrath,* 811 F.2d 1022, 1024 (7th Cir. 1987); *United States v. Torres,* 733 F.2d 449, 458 (7th Cir.), *cert. denied,* 469 U.S. 864, 105 S.Ct. 204, 83 L.Ed.2d 135 (1984); *United States v. Verkuilen,* 690 F.2d 648, 652–53 (7th Cir.1982). We have reviewed the record and are unable to say that the district court's failure to give the instruction was plain error.

Plain error depends on whether, in light of the entire record, "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *United States v. Jackson,* 569 F.2d 1003, 1010 (7th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978); *see also Douglas,* 818 F.2d at 1320 ("Plain error must be of such a great magnitude that it probably changed the outcome of the trial."). "Plain error analysis is not a panacea for every error of counsel; it is successfully employed only in the *most compelling case." Douglas,* 818 F.2d at 1320 (emphasis supplied); *see also United States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988).

We cannot say that the lack of the instruction probably affected the outcome of Mr. Herrera's trial. While the district court failed to give the instruction, it did remember to strike the reference to the alias in the indictment that the jury took into deliberations. During trial, the government never argued that Mr. Herrera's link to the Estevez conspiracy came from the documents bearing names similar to his. The government's key witness, Lawrence Jackman, disavowed any such link. Mr. Jackman explicitly testified that it was he who caused the various names to be placed on the documents in question and that he did not know Adalberto Herrera.

The incident cited by Mr. Herrera in which a juror referred to him as "Arroldo Herrera" occurred prior to Mr. Jackman's testimony and thus does not convince us that the jury actually was misled. In addition, we held in the previous section that the evidence was sufficient to convict Mr. Herrera of the conspiracy. Under these circumstances, Mr. Herrera has failed to convince us that the instruction probably would have changed the outcome of his trial. *See Clark,* 541 F.2d at 1018 (prosecution's use of alias not prejudicial although defendant would have been entitled to have the alias stricken had he renewed his motion to strike during trial).

## C. *Ineffective Assistance of Counsel*

Mr. Herrera claims that he was denied his sixth amendment right to effective assistance of counsel. Specifically, he asserts that his sixth amendment right was violated by (1) his trial counsel's failure to make a motion *in limine* to exclude the documents bearing Mr. Jackman's various aliases; (2) his trial counsel's failure to object at trial to the introduction of those documents; and (3) his trial counsel's failure to ensure that an appropriate cautionary instruction was given to the jury regarding this evidence.

■■■ The defendant bears a heavy burden in establishing an ineffective assistance of counsel claim. He must show (1) that his attorney's representation fell below an objective standard of reasonableness (performance prong), *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and (2) that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different (prejudice prong), *id.* at 694, 104 S.Ct. at 2068. *See also United States ex rel. Barnard v. Lane,* 819 F.2d 798, 802 (7th Cir.1987); *United States v. Hillsberg,* 812 F.2d 328, 336 (7th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). With regard to the performance prong, the defendant must identify the specific acts or omissions of counsel that form the basis for his claim of

ineffective assistance. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. The court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* The court's scrutiny of counsel's performance must be conducted with a high degree of deference and without the distorting effects of hindsight. *Id.* at 689, 104 S.Ct. at 2065; *United States v. Sherwood,* 770 F.2d 650, 655 (7th Cir.1985). As to the prejudice prong of the inquiry, a "reasonable probability" of a different result means "a probability sufficient to undermine confidence in the outcome [of the trial]." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

█ We doubt that the omissions cited by Mr. Herrera in support of his sixth amendment claim constituted ineffectiveness of counsel in light of his trial counsel's vigorous and competent representation throughout the long and complex trial. The three alleged errors all relate to how counsel dealt with the government's use of the alias. We would be more sympathetic to Mr. Herrera's claim if his counsel simply had ignored the problem. However, quite the contrary, Mr. Herrera's counsel quickly identified the issue and immediately took action in the district court by requesting that the alias be stricken from the indictment. And, while as a tactical matter it might have been a good idea for counsel to have objected when the documents were introduced at trial, we cannot say that his failure to do so was unreasonable in light of the fact that the objection most likely would have been denied. The documents clearly were admissible at trial as evidence of the conspiracy regardless of whether the alias found on the documents belonged to Mr. Jackman or to Mr. Herrera.

The only serious error counsel made was failing to ensure that an appropriate jury instruction was given. However, we do not think that this single error rendered counsel's entire performance below an objective standard of reasonableness. This is particularly true in light of counsel's vigilance throughout the trial in protecting Mr. Herrera's interests in the matter. Indeed, to rebut any possible connection between Adalberto Herrera and the names on any of the documents, counsel recalled Lawrence Jackman and had him repeat his testimony that he was the person who used the aliases and that he in fact did not know who Adalberto Herrera was. We thus doubt that any of the failures cited by Mr. Herrera individually or collectively fell below an objective standard of reasonable competence in the context of counsel's overall efforts to insulate Mr. Herrera from any potential prejudice due to the alias documents.

In any event, we do not think that Mr. Herrera has satisfied the prejudice prong of the *Strickland* inquiry. We already have held that the evidence was sufficient to uphold his conviction and that the failure to give the jury instruction was not plain error. We therefore conclude that Mr. Herrera has failed to show that the result of his trial would have been different in the absence of the alleged omissions on the part of his counsel. *See Hillsberg,* 812 F.2d at 336.[52]

#### D. *Severance*

Mr. Herrera's final argument is that the district court erred in refusing to grant him

---

52. Mr. Herrera's reliance on two cases that were decided before *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is misplaced. *See Arrowood v. Clusen,* 732 F.2d 1364 (7th Cir.1984); *Vela v. Estelle,* 708 F.2d 954 (5th Cir.1983), *cert. denied,* 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984). To begin with, both cases are factually inapposite. *Arrowood* involved both the failure to request a jury instruction regarding the trustworthiness of the defendant's pretrial statements and the failure to elicit testimony from the defendant regarding the police interrogation and circumstances surrounding those statements. 732 F.2d at 1372.

*Vela* involved counsel's failure to raise a specific objection or to request a curative instruction concerning testimony in a murer trial about the victim that was completely irrelevant to any material issue and was introduced solely to inflame the jury. 708 F.2d at 962. Moreover, both of these cases were decided under an ineffective assistance standard that was less demanding than *Strickland's* prejudice prong. *See Arrowood,* 732 F.2d at 1369 (defendant need only show that trial counsel's acts or omissions "may have impaired the defense"); *Vela,* 708 F.2d at 966 (applying standard of "actual and substantial disadvantage to the defense").

a severance under Rule 14. The principles governing our review are discussed *supra* in Part III–E. We therefore proceed directly to an evaluation of the arguments advanced by Mr. Herrera.

Mr. Herrera contends that he was entitled to a severance because of an alleged disparity in the evidence. He asserts that the evidence of a conspiracy involving his codefendants was overwhelming as compared with the relatively slight evidence linking him to the conspiracy. In addition, he contends that he was entitled to a severance because the documentary evidence bearing a name similar to his own would not have been admissible in his separate trial.

■ Denial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving defendant and his codefendants. *United States v. Peters*, 791 F.2d 1270, 1302, (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). In such situations, the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against him. *Id.; United States v. Kendall*, 665 F.2d 126, 137 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).

■ In the instant case, the trial court instructed the jury at several stages of the proceedings that it was to consider each defendant separately. Moreover, we have concluded above that the evidence was sufficient to support Mr. Herrera's conviction and that the district court's failure to give a jury instruction on the documents bearing the alias was not plain error. Accordingly, Mr. Herrera can demonstrate no actual prejudice from the joint trial.

## VI

### Appeal of Rigoberto Moya–Gomez, No. 87–1262

Mr. Moya–Gomez was convicted of one count of conspiracy (count 1) and one count

of possession with intent to distribute (count 18). He was sentenced to twenty years imprisonment on count 1, and five years imprisonment on count 18. The five-year prison term on count 18 is to be served consecutive to the twenty-year sentence imposed on count 1. He appeals from the district court's refusal to sever the trial of count 18 from his joint trial with his codefendants on count 1.

### A. Background

The events leading to count 18 were established at trial through the testimony of Special DEA Agent John Felts. Agent Felts testified that he was acting in an undercover capacity on August 19, 1986 when he was introduced to Mr. Moya–Gomez as a potential source of cocaine by Joe Cartagena.[53] He testified that he discussed the purchase of a large quantity of cocaine from Mr. Moya–Gomez and that he was given two ounces of cocaine on a "front" basis. Agent Felts was to sell these two ounces and pay Mr. Cartagena $3,000 the next day. This transaction was to be a show of good faith on the part of all parties concerned. On August 20, 1986, Agent Felts gave Mr. Cartagena $3,000 in prerecorded United States currency. He noticed Mr. Cartagena take $600 from the $3,000 and place that money in one pocket while placing the remaining $2,400 in another pocket. The following day, on August 21, 1986, Mr. Moya–Gomez was stopped on the highway and arrested. A search of his vehicle uncovered $41,000, including $2,400 of the prerecorded bills given to Mr. Cartagena the previous day.

Prior to trial, Mr. Moya–Gomez made a motion in the district court to sever count 18 from the remainder of the indictment. The district court denied the motion and held that joinder of the counts was proper under Federal Rule of Criminal Procedure 8(a). After he was convicted, Mr. Moya–Gomez again raised the severance question

---

**53.** Mr. Cartagena was indicted along with the other defendants in this case. He pleaded guilty and did not testify at trial.

in a motion for judgment of acquittal. The district court denied the motion. It held that Mr. Moya–Gomez was not entitled to a severance because he failed to show that he suffered any actual prejudice from the joint trial. Mr. Moya–Gomez contests the district court's finding of no prejudice. He argues that the court should have granted him a severance because the government failed at trial to prove a link between the drug transaction alleged in count 18 and the conspiracy alleged in count 1. He asserts that this failure prejudiced him because the jury may have concluded that he was guilty of the conspiracy and then found him guilty of count 18 because of his criminal disposition. He contends that the danger of this "spillover" effect was not outweighed by the economies of a joint trial because a separate trial on count 18 would have involved only the testimony of Agent Felts.

### B. *Analysis*

■ We first address the question of whether joinder of count 1 with count 18 was proper. Joinder under Rule 8(a) is permissible where offenses are (1) of the same or similar character, or (2) based on the same act or transaction, or (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Fed.R.Crim.P. 8(a).[54] However, Rule 8(b) allows charging in the same indictment two or more offenders only "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R. Crim.P. 8(b). In *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986), we stated that "the government may not tack the two subsections together and in one indictment charge different persons with committing offenses of 'similar character.' " *See also* 8 J.

Moore, *Moore's Federal Practice* § 8.06[1] at 8–25 (2d ed. 1982) ("Rule 8(a) may be applied *only* to offenses joined against a single defendant; when more than one defendant is charged, Rule 8(b) must be applied." (emphasis in original)). This means that joinder of counts 1 and 18 was permissible only if joined pursuant to the "same series of acts or transactions" part of Rule 8(b). *See United States v. Hatcher*, 680 F.2d 438, 440–41 (6th Cir.1982) (misjoinder found on the basis of an indictment that charged both defendants with heroin offenses and one with an unrelated cocaine offense in an overlapping time period). "The usual meaning [of 'same series of acts or transactions'] is acts or transactions that are pursuant to a common plan or scheme, which is to say (in the usual case) that the acts or transactions are parts of a single conspiracy." *Velasquez*, 772 F.2d at 1353 (citations omitted). Accordingly, in determining whether counts 1 and 18 were joined properly, we must decide whether the evidence was sufficient to establish a link between the August 19 transaction and the Estevez conspiracy.

Count 1 alleged a conspiracy to possess cocaine with the intent to distribute it. Count 18 alleged a specific instance of possession with intent to distribute. With regard to the possession count, Agent Felts testified that Mr. Cartagena told him that "he was having problems acquiring the cocaine because his people were out of Milwaukee at the time." Tr. of Dec. 1, 1986 at 854. Mr. Cartagena also told Agent Felts that "his main source of cocaine was busted about two weeks earlier." *Id.* When Agent Felts asked Mr. Cartagena who that was, Mr. Cartagena replied, "you know, Leon and that crew." *Id.* A few days later, Mr. Cartagena brought Agent Felts to see Mr. Moya–Gomez, who supplied the cocaine involved in count 18. Arguably, the jury could have inferred from the above testimony that Mr. Moya–Gomez'

---

**54.** Rule 8(a) provides in full:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are

based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
Fed.R.Crim.P. 8(a).

source was the Estevez family. If he did purchase the cocaine from the Estevez family, then count 18 would be linked sufficiently to the conspiracy alleged in count 1. "[O]ne who buys from a conspirator for resale is a member of the conspiracy if he knows at least its general aims." *United States v. Marks*, 816 F.2d 1207, 1212 (7th Cir.1987) (citing *United States v. Andrus*, 775 F.2d 825, 853–54 (7th Cir.1985)).

This theory is called into question, however, by the government's closing argument. In discussing the drug transaction alleged in count 18, the Assistant United States Attorney commented that "[o]bviously there was little or no connection with the Estevez group at that point of time. I can't begin ... to tell you who his [Moya–Gomez'] source of supply was." Tr. of Dec. 11, 1986 at 1904. Thus, the government seems to have disavowed that the August 19 transaction was in furtherance of the Estevez conspiracy. Nevertheless, the government appears to argue on appeal that counts 1 and 18 were properly joined because they were part of a common plan or scheme, and that the term "common plan or scheme" is broader than a single conspiracy. *See Velasquez*, 772 F.2d at 1353. In this regard, the government notes that the August 19 delivery of cocaine was arranged through Joe Cartagena, an individual affiliated with the Estevez organization, who was indicted and charged with being part of the conspiracy. In addition, Agent Felts was introduced to Mr. Cartagena by Felix Cordero, who also was indicted and charged with being part of the conspiracy. The government argues that this evidence permitted the inference that, although Mr. Moya–Gomez no longer managed the Milwaukee end of the Estevez operation after the summer of 1985, he continued to deal with the Estevez organization even after his more intimate involvement in the conspiracy was terminated. *See generally United States v. Goldman*, 750 F.2d 1221, 1224 (7th Cir.1984).

■ We think the question of whether the evidence at trial was sufficient to prove that the transaction alleged in count 18 was pursuant to the conspiracy alleged in count 1 is a close one. However, even if Mr. Moya–Gomez is correct that the evidence was not sufficient on this point, there is no misjoinder under Rule 8. Mr. Moya–Gomez concedes that the counts initially were joined properly as being parts of a single conspiracy; he argues only that the government ultimately failed to prove a link between count 18 and the conspiracy at trial. *See* Moya–Gomez' Br. at 6. Because joinder under Rule 8 is a matter of pleading rather than proof, Mr. Moya–Gomez' argument properly raises an issue of severance under Rule 14 rather than misjoinder under Rule 8. *See United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986) ("[O]nce the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14...."); *see also United States v. Garner*, 837 F.2d 1404, 1412 (7th Cir.1987) ("there is no requirement that the government demonstrate, at the pleading stage, sufficient evidence to support joinder"), *cert. denied,* —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *Velasquez*, 772 F.2d at 1354 ("the test for misjoinder is what the indictment charges, not what the trial shows"). Some cases hold that the absence of evidence at trial linking two sets of charges results in misjoinder *if* the defendant can show that the government knew that it could not prove a link when it joined the counts in the indictment and thus acted in bad faith. *Velasquez*, 772 F.2d at 1354. Mr. Moya–Gomez has not alleged bad faith in this case and therefore his claim must be addressed under Rule 14.

The principle is well established that a district court's denial of a motion under Rule 14 is reversible error only upon a showing of clear abuse of discretion. *See United States v. L'Allier*, 838 F.2d 234, 241 (7th Cir.1988); *United States v. Berardi*, 675 F.2d 894, 900 (7th Cir.1982); *United States v. Aleman*, 609 F.2d 298, 310 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rajewski*, 526 F.2d 149, 153 (7th Cir.1975), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976). "A defendant making a motion for severance

pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice.... The fact that a separate trial might offer a better chance of acquittal is not a sufficient ground for severance." *Goldman*, 750 F.2d at 1225 (citations omitted). However, in considering a Rule 14 claim "[w]hen the trial reveals that different offenses ... should not as a matter of fact have been joined in one indictment, the trial judge must be 'particularly sensitive to the possibility of ... prejudice.'" *Velasquez*, 772 F.2d at 1355 (quoting *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960)).

We do not think that Mr. Moya–Gomez has met his burden of demonstrating that this risk of prejudice was present in his case. Evidence of the conspiracy most likely would have been admissible in a separate trial on count 18 as other crimes evidence under Rule 404(b) of the Federal Rules of Evidence, albeit under limiting instructions. *See United States v. Liefer*, 778 F.2d 1236, 1240–44 (7th Cir.1985) (where defendant is charged with a specific intent crime, other crimes evidence is admissible to prove intent, even if defendant does not dispute his intent); *see also United States v. Gruttadauro*, 818 F.2d 1323, 1327–28 (7th Cir.1987). "In those instances where evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together." *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir.1976) (footnote omitted); *see also United States v. Possick*, 849 F.2d 332, 338 (8th Cir.1988).

Furthermore, even if, in a separate trial, the evidence would not have been admitted, we still would hold that the district court's denial of a severance was not an abuse of discretion in this case. Although the trial was long, the evidence on count 18 was not complex. As Mr. Moya–Gomez admits, the government's proof on count 18 consisted chiefly of the testimony of Agent Felts. There was little or no possibility that the jury could have been confused over which evidence related to which count. This court has observed that " '[t]he question of

whether a joint trial infringes upon the defendant's right to a fair trial depends on whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant.'" *United States v. Cavale*, 688 F.2d 1098, 1107 (7th Cir.) (quoting *United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981)), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 380, 74 L.Ed.2d 513 (1982); *see also Rajewski*, 526 F.2d at 155 ("If the jury can reasonably be expected to keep the evidence separate as to each count and each defendant, severance should be denied."). Here, the jury was instructed to give separate consideration to each count in the indictment. "This instruction was an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *Berardi*, 675 F.2d at 901. "Under our jury system ... it is fundamental that we reasonably trust juries to make factual determinations in accordance with the court's instructions." *Aleman*, 609 F.2d at 310. Taking all of these considerations into account, we conclude that Mr. Moya–Gomez has not met his heavy burden of demonstrating prejudice from the joinder of count 1 with count 18 so as to render the district court's denial of a severance an abuse of discretion.

### Conclusion

For the foregoing reasons, we affirm the convictions of all the defendants. We vacate Orlando's sentence and remand his case to the district court for resentencing.

IT IS SO ORDERED.